Filed 4/29/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>BA TRAN,<br><br>    Defendant and Appellant. | H036764<br>(Santa Clara County<br>Super. Ct. No. CC826024) |

## I.  STATEMENT OF THE CASE

A jury convicted defendant Ba Tran of first degree murder and found that in committing it he personally discharged a firearm and caused great bodily injury.  (Pen. Code, §§ 187, 12022.53, subds. (b), (c), & (d).)  The court sentenced him to an indeterminate term of 50 years to life.  On appeal, he claims the court erred in admitting testimony about statements defendant's brother made to a third party that incriminated defendant.

We find no error and affirm the judgment.

## II.  FACTS

### *Defendant Runs Fronts for Prostitution*

Officer Ryan Chan of the San Jose Police Department testified as an expert on prostitution in Santa Clara County.  He said that nail salons, massage parlors, and barber shops often operate as fronts for prostitution.  He explained that an owner will set up the front business and then delegate the day-to-day operation and security to a manager.  The

prostitutes split their earnings with the manager and owner. Officer Chan opined that in Santa Clara County, Asian gangs were not directly involved in running prostitution businesses or extorting money from them.

On April 3, 2008, Officers Chan and Dan Anderson of the San Jose Police Department conducted a sting operation at the Fantasy Salon on East Santa Clara Street in San Jose. Defendant's signature was on the lease for the salon. Officer Anderson negotiated a sex act with a woman in exchange for marked money. When she offered him a condom, he feigned heart problems, and defendant told him to leave. Officer Chan arrested defendant. He found large amounts of cash on his person and in his car. He also found the address of the Relax Health Spa among defendant's papers. He conducted a sting there, and learned that defendant's name was on the lease.[1]

### The Murder

At around 8:00 p.m. on November 17, 2008, Tuyet Tran, defendant's mother, came home. Defendant and his brother Tommy Tran were there.[2] Tuyet's red Mustang and a white Camry were parked out front. Defendant left at 8:30 p.m. Tuyet testified that defendant had long hair on the top and sides of his head. She said that defendant rarely drove the Mustang, and she denied telling the police that he left that evening in the Mustang.

Morgan Bruner testified that around 10:30 p.m. that night, he was driving on the Southwest Expressway and heard a burst of gunshots. He then heard a large engine revving and saw a red Mustang convertible speed by. The driver, who was its sole

---

[1] In August 2008, Campbell Police officers conducted a sting of the Fantasy Nail Salon on South Winchester in Campbell. At that time, a prostitute who had accepted money from an officer for a proposed sex act said that she had given some of it to defendant.

[2] Because defendant, his mother, and his brother share the same last name, we refer to Tuyet Tran and Tommy Tran by their first names for convenience and clarity and do not intend the informality as a sign of disrespect.

2

occupant, had very short hair on the sides of his head.  Sometime later, Bruner identified a photograph of a burned out Mustang as the car he had seen.

Melanie Acena lived at the apartment complex near the expressway.  She testified that around 10:30 p.m. that evening, she heard three or four gunshots followed by two or three more.  She looked out the window and saw a man standing in front of a Honda.  He then walked to a red Mustang about 50 feet away, entered, and drove away by himself.

Officer Kevin Laundrie of the San Jose Police Department responded to a report of gunshots near the expressway.  He found a Honda stopped in the middle of the road.  Its hazard lights were blinking, and the driver's side window was smashed.  Inside, Dieu Nguyen was slumped over the center console and dead from multiple gunshot wounds.  Sometime later, police searched the victim's house. They found an agreement to buy the Relaxation Health Center from Monica Ho and documents concerning how much money the victim had paid and the amount she still owed.[3]

Later that same night, police responded to a report of a burning Mustang.  It was registered to defendant's mother.  Inside, police found an expended nine millimeter shell casing consistent with those found at the scene of the murder.  All of the shells had been fired by the same gun.

Very early the next morning, police searched Tuyet's house.  She initially was cooperative but became evasive.  Police found a letter from Ho, business cards for the Relaxation Health Center, several driver's licenses for Vietnamese women, and a binder full of money.  Tuyet knew Ho and said she was defendant's friend or girlfriend.  She had seen them together.  Ho's nickname for defendant was "King."  Police also found several gun targets and a live nine millimeter round.

Jim Cook testified as an expert on cell phone sites and call location.  He developed overlapping maps concerning the location of cell phones belonging to defendant,

_____

[3]  In December 2007, Nguyen had been arrested for prostitution, and in May 2008, she was convicted.

Tommy, Johnny Trieu, and Ho. He testified that on the night of the murder, there were a number of calls from defendant's phone to Ho's phone from a location between the victim's home and the scene of the shooting. There were calls from defendant's phone to Tommy's phone from the scene of the shooting around the time it happened. There were additional calls from defendant's phone to Tommy's and Ho's phones a few minutes later from a location near Tuyet's residence. Cook also testified that there was a call at 10:53 p.m. from Tommy's phone to Trieu's phone.

Trieu, who said he was loyal to Tommy and would lie for him, testified that sometime after 10:00 p.m. that night Tommy called him and later came by and asked if he wanted to go some place to talk, drink, and fish. He said that something big had happened and he needed to burn some clothing. They drove to the Rio Vista area, where they burned clothing. While there, Tommy told Trieu that defendant had done something "really bad," namely, he had shot someone. Tommy also said that he had helped defendant burn his car. Tommy advised Trieu that if Trieu was questioned by the police, he should say that they had gone fishing and then slept most of the time.

Trieu testified that they returned to Tommy's house the next morning, and both slept there. Later that morning, they went out for some food and were stopped by the police. Trieu was scared and did not ask why they had been stopped. Later, at the station, the police interrogated Trieu, and he told them what had happened.

### The Defense

Defendant testified and denied killing Nguyen or helping anyone else kill her. He admitted being present when she was shot, but he blamed the murder on a Vietnamese gangster.

Defendant testified that he met Ho at a supermarket in 2006. Over the next six months they became romantically involved, and he moved in with her. He learned that she owned a beauty shop in San Jose that was a front for prostitution. Ho changed its location four or five times between 2006 and 2008. For a few years, defendant worked at

4

Ho's salon several hours a day, most days of the week. He provided security, bought condoms, transported the prostitutes, and handled the cash. He did not consider himself an employee and denied that Ho paid him. However, he admitted that she regularly gave him hundreds of dollars in cash.[4]

Defendant testified that during the time he worked at Ho's salon, he paid a Vietnamese gangster $2,000 per month as protection money for Ho. Defendant declined to identify the gangster by name or even describe what he looked like for fear the gangster would kill his family. Defendant said that in 2008, Ho sold her business to Nguyen for $26,000. He witnessed the transaction. He told Nguyen about having to pay protection money, but she said she had her own gang members and would not pay the gangster. After the sale, defendant never saw Nguyen again. When he stopped paying the gangster, Ho's prostitution business in Cupertino was vandalized.

Defendant testified that on the night of the murder, he was at home, and the gangster showed up with three other gang members in a Ford Explorer. Defendant went outside, and the gangster said, "Let's go for a ride." Defendant declined, but the gangster pulled a gun, looked at Tuyet's van, and commented that defendant's mother was home from her job at San Jose City College. Defendant became scared. The gangster then asked for defendant's cell phone, and defendant handed it to him.

At this point, defendant entered the Mustang and backed it out of the driveway. The gangster got into the passenger seat, one of his friends got into the driver's seat, and defendant got into the back. There, gangster took defendant's leather jacket, put it on, and started making calls on defendant's phone. The Mustang and Explorer drove to a Costco parking lot. The gangster made a number of calls, told defendant that he was

---

[4] Defendant testified that he wanted to join the California Highway Patrol (CHP). He had applied for a position, passed an examination, and was waiting to take a physical. He said that he sharpened his shooting skills by practicing at a shooting range. However, he denied having a gun and claimed the target and shell found at Tuyet's house were Tommy's.

"going to show you what happen[s] when you don't pay," and tossed the phone back to him. They then drove off. Defendant tried repeatedly, but unsuccessfully to call Ho, tell her what was happening, and warn her to leave the salon. Finally, she called him back, and he told her that the gangster was taking him for a ride.

At some point, defendant noticed that they were following a Honda. Suddenly, the gangster started shooting. They slowed and stopped. The gangster then handed the gun to the driver and told him to "take care of it." The driver got out and walked to the Honda, shooting as he went. He returned, gave the gun to the gangster, and they drove off. Defendant repeatedly called his brother and hung up as a signal to him.

The Mustang and Explorer entered the 280 freeway, drove to Milpitas, exited, and stopped on a side street. The gangster got out, threw defendant's jacket to him, and told him to "tell the whore Monica to pay, start paying again or she's going to end up like the whore Tina." At that moment, defendant knew Nguyen had been murdered. The gangster then pointed his gun at defendant and pulled the trigger a few times. It did not fire, and the gangster walked away.

Defendant thought that he was being set up to take the blame for killing Nguyen. Fearing this, he decided to burn the Mustang, change his appearance, get some money, and flee to Mexico and then back to Vietnam. To this end, he called Tommy and told him to get some gasoline and meet him. They met and set fire to the Mustang. Defendant then went to Ho's house, where she cut his hair. From there, he drove to Los Angeles and used his credit card for cash advances. He testified that he was too scared to call the police or identify the gangster.

Quyen Mai, a former Vietnamese gang member, testified as a gang expert for the defense and said that Vietnamese gangs are involved in a variety of crimes, including robbery, home invasion, homicide, extortion, and drugs. Gangs commonly extort money from local Vietnamese businesses, including restaurants, bars, massage parlors, and

6

prostitution businesses. They do not allow their victims to stop payments and retaliate when they do. Gangs might even kill, although he was not aware of that ever happening.

The defense also presented the testimony of a number of witnesses who heard shots being fired and then saw people and cars. Their testimony was inconsistent concerning the number of shots, number of cars, number of persons, and types of cars.

### III. ADMISSION OF TRIEU'S TESTIMONY CONCERNING TOMMY'S STATEMENT[5]

Defendant contends that the court erred in admitting Trieu's testimony about what Tommy said to him when they were at Rio Vista.

### A. Proceedings Below and Court Ruling

Defendant moved to set aside the information on the ground that in holding him to answer, the court had improperly relied on Trieu's testimony about Tommy's statements. That motion was denied. Thereafter, the prosecution sought a ruling that Trieu's testimony would be admissible at trial. The court granted the motion.

The court opined that Trieu's proposed testimony appeared to be double hearsay because it related statements that defendant had made to Tommy and statements that Tommy then made to Trieu. The court opined that defendant's statements were admissible under section 1220 as admissions by a party. The court found the statements by Tommy admissible under section 1230 as statements against Tommy's penal interests. The court acknowledged that the trustworthiness of Tommy's inculpatory statements was the key to their admissibility and that collateral, non-inculpatory statements were not admissible.

The court found that Tommy's statements to Trieu were highly reliable. It noted that Tommy made them while he was speaking to a friend during a late night trip to a remote area to burn defendant's clothing. The court found additional reliability in the fact later that the Mustang was found burned, as Tommy had reported to Trieu, and

---

[5] All unspecified statutory references in this section are to the Evidence Code.

Tommy was convicted of being an accessory to the murder. The court also noted that the cell phone records showed that defendant called Tommy around the time of the murder. Last, the court opined that Tommy's statements were not testimonial and did not implicate defendant's constitutional right to confront and cross-examine adverse witnesses. (See *Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. omitted [Sixth Amendment's confrontation clause prohibits admission of out-of-court "[t]estimonal statements of witnesses absent from trial [unless] the declarant is unavailable," and "only where the defendant has had a prior opportunity to cross-examine"].)

Later, at trial, the court found that Tommy was unavailable as a witness, and Trieu testified about what Tommy had said to him.

### B. Section 1230

Section 1230 provides, in relevant part, "[e]vidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."[6] "The proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)

---

[6] Section 1230 provides, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

8

" 'The focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.] In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' [Citation.] '[E]ven when a hearsay statement runs generally against the declarant's penal interest and redaction has excised exculpatory portions, the statement may, in light of circumstances, lack sufficient indicia of trustworthiness to qualify for admission. . . . [¶] . . . We have recognized that, in this context, assessing trustworthiness " 'requires the court to apply to the peculiar facts of the individual case a broad and deep acquaintance with the ways human beings actually conduct themselves in the circumstances material under the exception.' " ' [Citation.]" (*People v. Geier* (2007) 41 Cal.4th 555, 584, implicitly abrogated on another point in *Melendez-Diaz v. Massachusetts* (2009) U.S. 305 as acknowledged in *People v. Houston* (2012) 54 Cal.4th 1186, 1220.)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.] [¶] Clearly the least reliable circumstance is one in which the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. 'Once partners in crime recognize that the "jig is up," they tend to lose any identity of interest and immediately become antagonists, rather than accomplices.' [Citation.] However, the most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.] [¶] When examining what was actually said by the declarant special

9

attention must be paid to any statements that tend to inculpate the nondeclarant. This is so because a statement's content is most reliable in that portion which inculpates the declarant. It is least reliable in that portion which shifts responsibility. Controversy necessarily arises when the declarant makes statements which are self-inculpatory as well as inculpatory of another. This is why Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances. [Citations.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334-335 (*Greenberger*); accord, *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174-175 (*Cervantes*).)

When a trial court bases its ruling on a conclusion of law, or a mistake of law, we review de novo but when we review a ruling admitting or excluding evidence we ask whether the ruling is an abuse of discretion. (See *People v. McWhorter* (2009) 47 Cal.4th 318, 362.) In the gradations implied by abuse of discretion we look to the confidene we have in the correctness of the court's ruling. Thus, here we look to the middle ground of the range. As our high court said in *Sargon v. University of California* (2012) *California* (2012) 55 Cal.4th 747, 773, discretion "must be exercised within the confines of the applicable legal principles." The court went on to say: " 'The discretion of a trial judge is not a whimsical, uncontrolled power, but a legal discretion, which is subject to the limitations of legal principles governing the subject of its action, and to reversal on appeal where no reasonable basis for the action is shown.' (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 364, p. 420; see *Westside Community for Independent Living , Inc. v. Obeldo* (1983) 33 Cal.3d 348, 355 [quoting this language].) 'The scope of discretion always reside in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable

10

principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.] . . . [¶] The legal principles that govern the subject of discretionary action vary greatly with context. [Citation.] They are derived from the common law or statutes under which discretion is conferred." (*City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1297-1298.) To determine if a court abused its discretion, we must thus consider "the legal principles and policies that should have guided the court's actions." (*People v. Carmony* [(2004)] 33 Cal.4th [367,] 377.)" (*Ibid.*)

However, we independently review the trial court's preliminary determination that a declarant's statements bore sufficiently particularized guarantees of trustworthiness to be admissible. (*Cervantes, supra,* 118 Cal.App.4th at pp. 174-175 [de novo review of whether trustworthiness test is satisfied]; see *Lilly v. Virginia* (1999) 527 U.S. 116, 137 [independent review of whether guarantees of trustworthiness satisfy the confrontation clause].)

It is undisputed that Tommy was unavailable at trial, and defendant does not dispute the trial court's finding of unavailability. Thus, the issue is whether Tommy's statements were against his penal interests and sufficiently reliable and trustworthy to be admitted.

Essentially Trieu related three things: (1) Tommy said that he helped defendant burn the Mustang; (2) Tommy said that defendant had done something "really bad"; and (3) Tommy said that defendant had shot someone.

Tommy's assertion that he helped defendant burn the Mustang was against his penal interest because it rendered him potentially liable for arson. (Pen. Code, § 451.) Tommy's next assertions that defendant had done something bad and had shot someone were not, standing alone, against *Tommy's* penal interests. However, we must view those assertions in context. (*Duarte, supra*, 24 Cal.4th at p. 612; *Greenberger, supra,* 58 Cal.App.4th at p. 335.) So viewed, the two assertions revealed Tommy's knowledge that defendant had committed a crime. Thus, Tommy's three assertions taken together as a

11

single statement were incriminating because they rendered him potentially liable as an accessory to murder. (Pen. Code, § 32.) Specifically, the entire statement was compelling evidence that Tommy knowingly and purposefully assisted defendant in destroying evidence to help defendant escape arrest, prosecution, and punishment for a shooting. Indeed, Tommy's two assertions about what defendant had done were an inextricable part of what made his entire statement to Trieu contrary to his penal interests. (See *People v. Samuels* (2005) 36 Cal.4th 96, 120-121 [incriminating references to another person were inextricably tied to specific statement against declarant's penal interest].) Moreover, Tommy further inculpated himself as an accessory by going to a remote area to burn defendant's clothing.[7]

In *Wilson, supra,* 17 Cal.App.4th 271, the defendant was charged with a shooting. Before trial, his wife told the police that the defendant had called her from the jail, told her where to find the gun, and gave her instructions on how to dispose of it. She told the police that she had followed his directions. (*Id.* at p. 274.) At the defendant's trial, his wife invoked the marital privilege and declined to testify. (*Ibid.*) The trial court then permitted the prosecution to introduce the wife's statements to the police as declarations against her penal interest on the theory that they incriminated her as an accessory. (*Id.* at p. 275.)

---

[7] "The crime of accessory consists of the following elements: (1) someone other than the accused, that is, a principal, must have committed a specific, completed felony; (2) the accused must have harbored, concealed, or aided the principal; (3) with knowledge that the principal committed the felony or has been charged or convicted of the felony; and (4) with the intent that the principal avoid or escape from arrest, trial, conviction, or punishment." (*People v. Plengsangtip* (2007) 148 Cal.App.4th 825, 836; e.g., *People v. Wilson* (1993) 17 Cal.App.4th 271, 276 (*Wilson*).)

As the parties note, Tommy was charged and pleaded guilty to being an accessory. In pleadings below, the parties agreed that Tommy had pleaded guilty to being an accessory. Thereafter, he failed to appear at defendant's preliminary hearing, he failed to report to parole, and the prosecution was unable to locate him.

On appeal, the defendant claimed the statements were not specifically against his wife's penal interests. The court disagreed. It noted that accessory liability attaches only to a person who acts with knowledge that a principal has committed or been charged with the commission of a felony. The court reasoned that the defendant's statements to his wife established her knowledge that the defendant had committed the shooting. Thus, the entire statement the wife made to the police was disserving of her penal interests. (*Wilson, supra,* 17 Cal.App.4th at p. 276.) The court acknowledged that her statement was also disserving to the defendant. However, the court opined that that did not render her statement unreliable and inadmissible. (*Ibid.*)

Here too, Tommy's statement entire was inculpatory as were his statements about burning defendant's clothing. The fact that Tommy's statement also implicated defendant did not render it unreliable or inadmissible.

Moreover, the circumstances under which Tommy confided to Trieu are compelling indicia of reliability and trustworthiness. Tommy knew of defendant's crime, he helped defendant burn the Mustang, and he apparently agreed to burn defendant's clothing as well. Despite the incriminating nature of this information, Tommy called Trieu, a trusted friend, and asked for his assistance. Together, they went to a remote place, where Tommy could speak freely and in confidence. He then made the incriminating statements about helping defendant cover up what defendant had done and needing to burn defendant's clothing. As noted, the circumstance most indicative of reliability is where an incriminating conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. (*Greenberger, supra,* 58 Cal.App.4th at p. 335.) Moreover, the timing and urgency of Tommy's conduct further support the reliability of his statement.

Defendant claims that although Tommy's statement is facially inculpatory, it was actually self-serving and exculpatory. He asserts that when Tommy spoke to Trieu, he was potentially liable for arrest and prosecution as a coconspirator with defendant for the

13

murder of Nguyen. Thus, according to defendant, Tommy had an interest in avoiding serious liability for conspiracy, and this provided a motivation to make defendant seem solely responsible for the murder and to claim that he merely helped defendant burn the car after the fact. Indeed, defendant suggests that in asking Trieu to join him at Rio Vista, Tommy was using Trieu to help construct a defense to a conspiracy charge. Thus, given Tommy's self-interest and motivation at the time he made his statement, defendant argues that the statement is wholly unreliable and untrustworthy and that the trial court erred in finding otherwise.[8] (See *Duarte, supra*, 24 Cal.4th 603, 612 ["[e]ven a hearsay statement that is facially inculpatory of the declarant may, when considered in context, *also* be exculpatory or have a net exculpatory effect" that renders it unreliable and inadmissible].)

First, the notion that Tommy's statement was motivated by fear of potential liability as defendant's coconspirator is, in our view, far fetched.

A conspiracy is an agreement by two or more persons to commit an offense with the specific intent to commit the elements of the offense, coupled with an overt act by one or more of the conspirators in furtherance of the conspiracy. (Pen. Code, §§ 182, subd. (a)(1), 184; *People v. Jurado* (2006) 38 Cal.4th 72, 130; *People v. Russo* (2001) 25 Cal.4th 1124, 1131.) "To prove an agreement, it is not necessary to establish the parties met and expressly agreed" to commit the target offense. (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1025.) Rather, " 'a criminal conspiracy may be shown by direct or circumstantial evidence that the parties positively or tacitly came to a mutual understanding to accomplish the act and unlawful design.' " (*Ibid.*, quoting *People v. Brown* (1969) 272 Cal.App.2d 623, 628.) Thus, " 'a conspiracy may be inferred from the

---

[8] Defendant did not advance this theory in opposition to the admission of Trieu's testimony about Tommy's statement. However, we do not treat the omission as a forfeiture of the argument because, as noted, we independently review whether statements bear sufficiently particularized guarantees of trustworthiness to be admissible. (*Cervantes, supra,* 118 Cal.App.4th at pp. 174-175.)

14

conduct, relationship, interests, and activities of the alleged conspirators before and during the alleged conspiracy. [Citations.]' " (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1135; *People v. Herrera* (2000) 83 Cal.App.4th 46, 64.)

According to defendant, Tommy faced possible prosecution for conspiracy to kill Nguyen because:  (1) before the killing, Tommy and defendant were together at Tuyet's house; (2) shortly after the killing, defendant called Tommy, told him to bring gasoline, and they burned the Mustang; and (3) later, Tommy went to Rio Vista to burn defendant's clothing.

It is settled that mere association and suspicion of criminal conduct is not enough to establish a conspiracy or even an agreement; there must be some evidence to demonstrate that the association is also a conspiracy.  (*People v. Powers-Monachello* (2010) 189 Cal.App.4th 400, 419; *People v. Lowery* (1988) 200 Cal.App.3d 1207, 1218; *People v. Hardeman* (1966) 244 Cal.App.2d 1, 41.)  For example, in *United States v. Penagos* (9th Cir.1987) 823 F.2d 346, the court found that the defendant was present when the drug dealer loaded and unloaded cocaine in automobiles and later was a passenger in a car that delivered some cocaine insufficient to link the defendant to a drug conspiracy.  (*Id*. at p. 351. e.g., *People v. Samarjian* (1966) 240 Cal.App.2d 13, 17; *People v. Zoffel* (1939) 35 Cal.App.2d 215, 225.)

On the other hand, where there is some evidence that a person participated in committing the target offense or had an interest in its commission, such evidence together with evidence of association can be sufficient to support an inference of a conspiracy to commit that offense.  (*People v. Consuegra* (1994) 26 Cal.App.4th 1726, 1734; *People v. Ordonez* (1991) 226 Cal.App.3d 1207, 1232; *People v. Lipinski* (1976) 65 Cal.App.3d 566, 575; *People v. Hardeman, supra*, 244 Cal.App.2d at p. 41.)

Here, the evidence of Tommy's association with his brother is minimal and undefined.  There is no evidence of what they did or said at the house before defendant left; no evidence that Tommy knew where defendant was going or what he intended to do

15

when he left; and no evidence that Tommy did anything before defendant called him that advanced or facilitated the murder or suggested that Tommy harbored an intent to facilitate that crime. Moreover, there is no evidence that Tommy was involved in the prostitution business in general or in defendant and Ho's business in particular; no evidence Tommy knew that Nguyen had bought Ho's business; no evidence suggesting that Tommy had some personal reason to kill Nguyen or interest in having her killed; and no evidence Tommy even knew who Nguyen was before she was murdered.

In short, the evidence supports a strong inference that *after* the murder, Tommy agreed to help defendant by burning the Mustang and then defendant's clothing. However, the evidence permits only speculation that Tommy and defendant agreed *in advance* to kill Nguyen. And it is speculation based on speculation to further infer that Tommy's voluntary, self-incriminating statements in confidence to his friend Trieu about being an accessory were motivated by a desire to avoid greater liability as a co-conspirator.

Having independently reviewed Tommy's statement and all of the surrounding circumstances (*Cervantes, supra,* 118 Cal.App.4th at pp. 174-175), we do not find that Tommy's statements were too unreliable and untrustworthy to be admitted as statements against his penal interests. Accordingly, admitting them was not an abuse of discretion.

We further note that defendant's theory of unreliability is not that Tommy faced sole liability for killing Nguyen and thus had a motive to falsely accuse defendant and shift total responsibility from himself to defendant. Defendant's admitted presence during the shooting and Tommy's absence precludes such a theory. Rather, defendant's theory of unreliability is that Tommy and defendant agreed to kill Nguyen sometime before defendant left to kill her, and for that reason, Tommy and defendant faced shared liability as coconspirators. Thus, the viability of defendant's conspiracy theory depends on defendant's involvement as a coconspirator in the killing. Certainly, Tommy's alleged interest in avoiding shared liability would taint assertions designed to make it seem as if

16

defendant was *solely* responsible for the killing and had acted *alone*. However, we fail to see how an interest in avoiding *shared* liability undermines assertions that defendant was involved and shot Nguyen. Indeed, defendant's theory appears to depend on the *reliability* of his assertions that defendant was involved as a coconspirator. Thus, even if the evidence reasonably supported an inference that Tommy and defendant conspired to kill Nguyen, we would not find that Tommy's interest in avoiding coconspirator liability rendered his statement to Trieu unreliable and untrustworthy.

## C. Section 1220[9]

Defendant claims that even if Tommy's statement was reliable, the court nevertheless erred insofar as it found Tommy's assertions that defendant had done something big and had shot the victim admissible as admissions by a party under section 1220. As defendant correctly notes, Trieu testified that Tommy directly told him that defendant had done something big and had shot someone; Trieu did not testify about what Tommy said *defendant* said to him.

It appears that before trial, during the hearing on the admissibility of Trieu's testimony, the prosecutor proceeded on the theory that defendant told Tommy what he had done, Tommy then told Trieu what defendant had said he had done, and Trieu would testify that Tommy told him what defendant had said. This view of Trieu's proposed testimony explains the court's view that Trieu's testimony contained double hearsay: what defendant said to Tommy; and what Tommy said to Trieu. At trial, Trieu's testimony was simply that Tommy said what defendant had done. For this reason, we agree that those particular statements by Tommy were not admissible under section 1220 as admissions by a party.

---

[9] Section 1220 provides, "Evidence of a statement is not made inadmissible by the hearsay rule when offered against the declarant in an action to which he is a party in either his individual or representative capacity, regardless of whether the statement was made in his individual or representative capacity."

17

Nevertheless, as discussed above, all three components of Tommy's statement to Trieu were admissible and properly and expressly admitted under section 1230 as statements against Tommy's penal interests.  Accordingly, any alleged error in ruling that two of the components were admissions under section 1220 was harmless.  (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

## IV.  DISPOSITION

The judgment is affirmed.

_____
RUSHING, P.J.

WE CONCUR:

_____
PREMO, J.

_____
ELIA, J.

*People v. Tran*
**H036764**

18

Trial Court:                                       Santa Clara County
Superior Court No.:  CC826024

Trial Judge:                                      The Honorable Ron M. Del Pozzo

Attorney for Defendant and Appellant
Ba Tran:                                          Eric Weaver
under appointment by the Court of
Appeal for Appellant

Attorneys for Plaintiff and Respondent
The People:                                    Kamala D. Harris
Attorney General

Dane R. Gillette,
Chief Assistant Attorney General

Gerald A. Engler,
Senior Assistant Attorney General

Seth K. Schalit,
Supervising Deputy Attorney General

Dorian Jung,
Deputy Attorney General

*People v. Tran*
**H036764**