Filed 3/24/14  P. v. Spencer CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B241312 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. TA119454) |
| v. | |
| JAMAL LEE SPENCER, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Paul A. Bacigalupo, Judge.  Affirmed.

Landra E. Rosenthal, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, James William Bilderback II and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

Appellant Jamal Lee Spencer appeals from the judgment entered following his conviction by jury of first degree murder (Pen. Code, § 187) with personal use of a firearm, personal and intentional discharge of a firearm, and personal and intentional discharge of a firearm causing great bodily injury and death (Pen. Code, § 12022.53, subds. (b), (c), & (d)) with findings he committed the murder for the benefit of a criminal street gang (Pen. Code, § 186.22, subd. (b)) and with court findings he suffered a prior felony conviction (Pen. Code, § 667, subd. (d)) and a prior serious felony conviction (Pen. Code, § 667, subd. (a)), and served a prior prison term (Pen. Code, § 667.5, subd. (b)).  The court sentenced appellant to prison for 55 years to life.  We affirm the judgment.

## FACTUAL SUMMARY

1. *Ashley Brown's Testimony.*

Viewed in accordance with the usual rules on appeal (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206), the evidence established that about 8:50 p.m. on October 11, 2010, Ashley Brown was sitting on the porch of her home in the area of 109th and Figueroa. She was across the street from an alley on 109th.  Brown saw a male exit the alley.  She believed the male could have been a gang member.  The male moved his pants in a way that indicated to Brown that he might have had a gun.  The man walked west to 109th and Figueroa.

Brown called to a person she referred to as Dog.  The male met Dog and Rico at 109th and Figueroa.  (Dog and Rico were later identified as Dwayne Crawford and Enrico Willingham (the decedent), respectively.)

Brown entered her house, then heard gunshots and ducked.  After everything was over, she looked out her window and saw Crawford in the street, Willingham running to his door, and the male walking back towards the alley.  She did not see the male enter a car.  She did not want to testify and was afraid for her safety.

Brown told police who came to her home the male was five feet six inches to five feet eight inches tall.  She gave no further physical description because it was dark and

2

she had not been paying attention to the male. Brown told detectives the male had a brown or dark complexion. She also told detectives she had seen the male walk to a car, but testified her statement was based on hearsay.

In December 2010, Brown identified appellant during a photographic lineup (appellant's photograph was photograph No. 3), but told detectives she was not sure of her identification. Brown thought she was under pressure and had to choose someone, and she just guessed. Brown testified, ". . . I didn't see the guy's face, so how am I supposed to pick a guy out? And it was like, what, 8:00 o'clock at night." Brown denied she felt the detectives pressured her, but they kept asking her if she was sure. Brown testified, "So I just picked it, okay? I had stuff to do. I just picked it so I could go."

Brown denied she told detectives she saw a car proceeding eastbound on 109th and containing two males who nodded as the car passed. However, Brown told detectives there were three Black males in the car. Los Angeles Police Detective Michael Levant testified Brown told him she saw a car pass by as its occupants nodded.

This court has listened to the CD recording of the detectives' interview during which Brown identified appellant as part of the above photographic lineup. Levant indicated to Brown the photographs might or might not depict the person who committed the offense, and Brown indicated she understood. Another detective told Brown the detectives did not want her to guess, and she indicated she understood. That detective also told Brown to take her time. Brown told the detectives her best opinion was photograph No. 3 depicted the person, although she was not sure. Brown commented, "the boy supposed to have a tattoo right here." Brown provided detectives with additional information about the crime and, on her initiative, gave detectives her cell phone number.

2. *Crawford's Testimony.*

Crawford testified as follows. When Crawford was younger, he was a member of the Nickerson Garden Bounty Hunters gang. At one time, long before trial, he was considered to be an original gangster. Crawford had suffered prior convictions and had

3

been to prison many times.  Crawford was in custody at time of trial and testified "they're trying to give me 35 to life."

About 8:50 p.m. on October 11, 2010, Crawford was in the area of 109th and Figueroa when he saw Willingham.  Crawford asked if Willingham wanted a beer and Willingham agreed to accompany him.  Crawford was drunk.  Crawford heard girls tell him, "Dog, look out."  Crawford turned and saw a male walking up the street.  Willingham stood behind Crawford, and the male approached the two.  Crawford testified "we [were] on the corner," there were streetlights, and it was dark.  The male asked if Willingham and Crawford were from Lane.  (Lane was a reference to the Denver Lanes, a Bloods gang.)  Crawford replied no.  The male asked where the Lanes were, and Crawford replied he did not know.  Willingham lived nearby.

The male said he was from PDL, i.e., the Pasadena Denver Lanes.  (PDL was another Bloods gang.)  The male also said he had just been chased by Raymonds.  (The Raymonds were a Crips gang.)  Crawford told the male if he were from PDL, he should know where the Lanes were.  Crawford approached the male, who told Crawford, "Get up off me, O.G."  Willingham told the male that the male had heard what Crawford had said, they were not from Denver Lanes, and they were from the Bounty Hunters.  The male pulled out a gun and fired twice.  Crawford was about five feet from the male.  Willingham, mortally wounded, fled down 109th towards his house.  Someone ran down the middle of the street, entered a black car, and drove away on 109th.  The male had tattoos under his left eye.  Crawford also testified they were teardrop tattoos.[1]

In December 2010, Crawford selected photograph No. 3 during a photographic lineup.  He told detectives "[i]t appeared similar to the dude that looked like the shooter."  Crawford testified he probably told detectives "[Crawford] bet [his] life that that was him."  The prosecutor asked, "Did you tell them that you looked at [the photograph] and pushed it away and said you don't need to go any further, that's him?"  Crawford replied,

---

[1] The prosecutor commented during jury argument that a photograph of appellant taken at a 45-degree angle supported Crawford's testimony appellant had a tattoo near his left eye.

4

"Yeah, I probably did that night." Crawford denied at the preliminary hearing he saw the shooter, and Crawford denied at the preliminary hearing and at trial that appellant was the shooter.

3. *Testimony by Levant and Forensic Evidence.*

Levant testified that when he and his partner conducted the photographic lineup with Crawford, Crawford looked at photograph No. 3 (appellant's photograph) for a brief moment. Crawford then pushed it away, sat back in his chair, turned away, and essentially told detectives, "Man, I don't even have to look any further. It's no. 3, homie." Crawford repeatedly said he would be willing to bet his life on it. Levant and his partner interviewed Crawford three times and he was very cooperative, but Crawford's demeanor completely changed at the preliminary hearing.

Levant testified appellant was five feet six inches tall. Appellant had the name Lera tattooed under his left temple, and a tattoo of a star with flames on his neck. Kashad Benedic (discussed *post*) was six feet one inch tall.

During an interview, appellant told Levant the following. On October 11, 2010, appellant was at home with his mother. Lera was the name of appellant's grandmother or great-grandmother. In October 2010, appellant's brother was the victim of a gang-related stabbing.

In December 2010, Levant searched appellant's residence and found, inter alia, gang paraphernalia, including a book that had "Bolo" on the front. Appellant's brother, Dwayne Brooks, was present during the search, and his moniker was Little Baby Bolo. Grand was about a block from Figueroa, and one could proceed straight from 109th and Grand onto the southbound 110 Freeway.

Jeffrey Gutstadt, a deputy medical examiner, testified Willingham died as a result of two gunshot wounds, one to his right upper back, and the other to his left lower back. Gutstadt recovered from Willingham's body the bullet that caused the wound to his left lower back. A criminalist testified the recovered bullet was a .32-caliber bullet.

5

4. *Telephone Calls From Jail.*

Appellant, in jail, spoke to an unidentified male (male) by phone. A transcript of the conversation reflects as follows. Appellant told the male that appellant was "in jail for a hot one." Appellant indicated "they"[2] were saying Rat Tone and Shotty (Shotty was Benedic's moniker) were telling on appellant. Appellant asked the male what that meant. Appellant also indicated Shotty was in jail. Appellant asked, "But like if somebody telling . . . say somebody is telling right? Can you find a person guilty if somebody telling[?]" The male replied, "Yeah . . . if you fight, take it all the way to trial, yeah."

Appellant then said, ". . . the gun got to be there to [*sic*] though right? Appellant indicated "they" were saying "they" had videotape. Appellant also indicated "they" showed three CD's to him. Appellant suggested someone was "trying to get off by saying [appellant] did it." Appellant later said, "They need the gun and all that other shit to [*sic*] huh?

Appellant subsequently said, ". . . they said they got, . . . photos of me, and all people pointing me out . . . but homies though . . . that could be a lie to [*sic*] huh?" The male told appellant to wait until appellant talked with his counsel, appellant's counsel would tell appellant "everything that they got," and appellant could then make his decision on "how [appellant] play[s] . . . the ball game."

On October 23, 2010, Benedic, in jail, spoke by phone to appellant and Robert Espree (aka Tiny Face).

5. *Benedic's Statement to Richard Gentle.*

On October 19, 2010, Benedic made certain jailhouse statements to Richard Gentle, another Hoover member. We discuss them *post*.

---

**2** Levant testified appellant made telephone calls shortly after Levant interviewed him.

6. *Gang Evidence.*

Los Angeles Police Officer Jason Sharman, a gang expert, testified as follows. The Hoover gang was once, but was no longer, a Crips gang. Hoover cliques included the 9-Deuce or 9-2 clique and the 107 clique. Hoover's symbols included a star.[3] Hoover's rivals included the Denver Lane Bloods and the Raymond Avenue Crips. The last two gangs were rivals of each other. The Willingham shooting occurred in territory claimed by Denver Lane.

Appellant was a member of the 9-Deuce clique of Hoover and his moniker was Baby Bolo. A photograph of appellant depicted a five-pointed star, a Hoover symbol, on the left side of his neck. Benedic was a member of the 107 or Selo clique of the Hoovers and his moniker was Shotty. Gentle was a member of the 9-Deuce or Dulo clique of Hoover. In response to a hypothetical question based on evidence, Sharman opined the present offense was committed to benefit, or in association with, a criminal street gang.

Appellant presented no defense evidence.

## ISSUE

Appellant claims the trial court erred by admitting into evidence Benedic's statement to Gentle.

## DISCUSSION

1. *The Trial Court Properly Admitted Into Evidence Benedic's Statement to Gentle.*

a. *Pertinent Facts.*

On October 19, 2010, Levant learned Benedic was in jail following his arrest. Levant spoke with Gentle, who was also in jail following his arrest on an unrelated gun charge. Levant discussed shootings with Gentle, including the Willingham shooting.

---

[3] Sharman testified the gang phrases "on the set," "on Hoovers," and "on vers," meant "I swear." Hoover members used the words "groove" and "groovy" to greet one another or to refer to another member. The word "crimies" referred to persons with whom crimes were committed. To "do missions" meant to go and actively commit crimes, such as shootings and murders.

7

Levant arranged to have Benedic and Gentle placed in a cell where their statements would be surreptitiously recorded.

During the People's case-in-chief, the prosecutor, having granted Benedic use immunity, called him as a witness, but he refused to testify and the court concluded he was unavailable as a witness. The prosecutor then moved to admit into evidence Benedic's redacted jailhouse statement to Gentle (Benedic's statement) that had been surreptitiously recorded when the two were in the monitored cell. The prosecutor argued the statement was hearsay that fell within the declaration against interest hearsay exception of Evidence Code section 1230. The prosecutor indicated Benedic was a suspect in this case but did not know that, and Benedic was in custody on another matter.

Appellant objected Benedic's statement was not a declaration against Benedic's interest because the statement was not specifically disserving to Benedic and it incriminated appellant. Appellant conceded Benedic's statement was nontestimonial but nonetheless objected to it on Sixth Amendment grounds.

The court indicated as follows. Benedic did not know that he was a suspect, that he was being charged, or that his statement was being recorded. He spoke confidentially to a fellow gang member. Benedic spoke in code and laid out his role in a crime. The court suggested Benedic would not have done so if he had thought Gentle was going to disclose Benedic's statement. The court ruled Benedic's statement was admissible.

Benedic's statement is reflected in CD recordings and transcripts admitted into evidence. We discuss portions of Benedic's statement where pertinent below.

8

b. *Analysis.*

Appellant claims the trial court erred by admitting into evidence Benedic's statement. Appellant argues Benedic's statement was not admissible under the Evidence Code section 1230[4] declaration against interest hearsay exception, and admission of the statement into evidence violated appellant's federal constitutional right to confrontation. We reject both arguments.

(1) *Benedic's Statement Was a Declaration Against His Interest.*

"The proponent of [evidence of a declaration against penal interest] must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character." (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611 (*Duarte*).)

"[A]s the high court has noted, 'whether a statement is self-inculpatory or not can only be determined by viewing it in context.' [Citation.]" (*Duarte*, *supra*, 24 Cal.4th at p. 612.) "There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 334.)

In *People v. Tran* (2013) 215 Cal.App.4th 1207, the defendant committed murder. Tommy, the defendant's brother, later told Trieu (1) Tommy had helped the defendant

---

**4** Evidence Code section 1230 states, "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . *so far subjected him to the risk* of . . . criminal liability, . . . or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true." (Italics added.) There is no dispute Benedic was "unavailable as a witness" within the meaning of section 1230.

9

burn a car (that contained incriminating evidence of the murder); (2) the defendant had done something really bad, and (3) the defendant had shot someone. The trial court concluded the declaration against interest hearsay exception applied to the statements, and the defendant appealed. (*Id.* at pp. 1210, 1215.)

*Tran* concluded the first statement was against Tommy's interest because he admitted committing arson. (*People v. Tran, supra,* 215 Cal.App.4th at p. 1218.) *Tran* acknowledged the second and third statements, standing alone, were not against Tommy's interest. (*Ibid*.) However, *Tran* stated, ". . . we must view those assertions in context. [Citations.] . . . Tommy's three assertions *taken together as a single* statement were incriminating because they rendered him potentially liable as an accessory to murder. [Citation.]" (*Id*. at pp. 1218-1219, italics added.)

*Tran* continued, "Specifically, the *entire* statement was compelling evidence that Tommy knowingly and purposefully assisted defendant in destroying evidence to help defendant escape arrest, prosecution, and punishment for a shooting. Indeed, Tommy's two assertions about what defendant had done were an *inextricable part of what made his entire* statement to Trieu contrary to his penal interests. (See *People v. Samuels* (2005) 36 Cal.4th 96, 120–121 [incriminating references to another person were inextricably tied to specific statement against declarant's penal interest].)" (*Tran*, *supra*, 215 Cal.App.4th at p. 1219, italics added.)

If the declaration against interest hearsay exception otherwise applies to a statement, the mere fact the statement also inculpates a nondeclarant, including a defendant, does not render the exception inapplicable. (*Tran*, *supra*, 215 Cal.App.4th at pp. 1218-1220.) We review for abuse of discretion a trial court's ruling as to whether the declaration against interest hearsay exception applies. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1250-1251.)

We note at the outset the prosecutor's theory of this case was appellant, Benedic, and Espree committed the present crime, appellant was the shooter, and Benedic and Espree were in the car. We consider below various individual statements of Benedic, and

10

what -- when they are considered in the context of his entire statement and the evidence in this case -- they reasonably implied he was saying based on personal knowledge.

At the beginning of the conversation between Benedic and Gentle, both identified themselves as from the Hoover gang. Benedic said he was from 107th Street, and Gentle indicated he was from 92nd Street. Benedic indicated his moniker was Shotty, and Gentle indicated his moniker was Tiny Deuce Star.

At one point, Benedic stated, "Couple of . . . nigga's that you mentioned when we first started talking, two on one (unintelligible) that was a crazy day, though, on the set." This statement implied that, based on Benedic's personal knowledge concerning the shooting in this case, he was describing the day of the shooting as a crazy day involving, on the one hand, Crawford and Willingham as "two" Bounty Hunter members and, on the other, appellant as the "one" Hoover member and shooter. This court has listened to the recording of the above statement; when Benedic made this particular statement he spoke in hushed tones, evidencing consciousness of wrongdoing.

Later, Gentle indicated a person had been shot in the leg. Benedic stated, "Hell no." After Gentle indicated he knew nothing about it, Benedic said, "No leg. Two to the head. For nine two." These statements implied Benedic was correcting Gentle concerning the location of Willingham's *two* gunshot wounds by accurately telling Gentle they were not in Willingham's *leg*,[5] and that the shooting had been done for the *9-2 Deuce* clique of Hoover (a clique of which appellant was a member).

Moreover, this court has listened to the CD recording of the above statements by Benedic. Benedic's tone when he stated, "Hell no" was emphatic and corrective. His tone when he stated, "No leg. Two to the head. For nine two" was deliberate, emphatic, and implied certainty about what he was saying. His tone indicated personal knowledge of the events.

---

[5] During jury argument, the prosecutor commented appellant shot Willingham in the upper back, and "[appellant] doesn't stick around to inspect [Willingham's] body to see where exactly the shots hit." After the shooting, Brown observed Willingham fleeing.

11

The following also occurred: "[Benedic]: You know who did it, and you know his two crimies. [¶] Gentle: You mentioned them, nigga. [¶] [Benedic]: Yeah? What did I say? [¶] Gentle: Come on groovie I know, nigger, on ver, nigger, on hoover, because I asked the (unintelligible) on ver. Had to do that for a little. [¶] [Benedic]: That was crazy, though. That whole scenario, Darktown, that was supposed to be my kill but that wasn't my 32, it was his shit. Knock, knock, eerrr, on the way to Gardena."

The above statement implied Benedic was indicating he knew the shooter and the shooter's two accomplices, the shooting in this case presented a crazy situation, Benedic was the person who was supposed to have killed Willingham, but Benedic did not do so because the .32-caliber gun used to kill Willingham belonged to the shooter (appellant), not Benedic. We note a .32-caliber bullet was recovered from Willingham's body. The statement implied that, prior to the killing of Willingham, Benedic had discussed with his fellow gang members and/or appellant the topic of Benedic killing Willingham.

Moreover, this court has listened to the CD recording of Benedic's statement, "Knock, knock, eerrr, on the way to Gardena." Benedic spoke in hushed tones when he said it, evidencing consciousness of wrongdoing. Moreover, the words "Knock, knock," sounded like Benedic imitating gunshots, and his expression "eerrr" sounded like him imitating sounds of screeching tires. That is, this statement was evidence Benedic was reciting from personal knowledge, based on his sensory perception of the events, what happened during the shooting. We also note Willingham was shot near the southbound 110 Freeway, and Benedic suggested that, after the shooting, the car containing the shooter went to Gardena. This too provided evidence of Benedic's personal knowledge of what had happened.

The following also occurred: "[Benedic]: That nigga uhh, Baby Bolo, they got that 32? [¶] Gentle: Yeah. Thought I didn't know nigger, I'm a 9-Deuce. [¶] [Benedic]: Deuce. Yeah, I'm goo talking about he's talking about he wasn't gon tell nobody goo. [¶] Gentle: Yeah. [¶] [Benedic]: he like 'on baby monster goo, . . . on 9-Deuce goo . . . Gardena, *me* and Tiny face . . . ." (Italics added.) The following occurred

12

shortly thereafter: "[Benedic]: Baby Bolo on 9-Deuce, I'm a get me, I'm a get me one. I'm going to get me one for my -- [¶] . . . [¶] Gentle: Yeah, . . . L-I-L.[6] [¶] [Benedic]: Like yeah?"

Benedic's first question implied a reference to the .32-caliber gun used by Baby Bolo, i.e., appellant, to shoot Willingham. Benedic next indicated appellant had told Benedic that appellant was not going to tell anyone what had happened. Benedic's statement implied he was surprised appellant had told anyone. That is, Benedic expressed surprise appellant had indicated to anyone outside the group of those involved—appellant, *Benedic*, and Espree—what had happened. Benedic also indicated appellant had referred to 9-Deuce, Gardena, *Benedic*, and Tiny Face (i.e., Espree).

This court has listened to the CD recording of the above statements. When Benedic referred to Baby Bolo, Benedic did so barely audibly, evidencing consciousness of wrongdoing. Moreover, the statements of Benedic and Gentle implied appellant had told Benedic that appellant was going to "get me one" for "L-I-L," i.e., appellant was going to retaliate for the shooting of his brother, Little Baby Bolo. Benedic replied "Like yeah?" in an approving tone. Benedic's statements reflected knowledge and involvement in the shooting of Willingham.

Benedic later said, "I love Baby Bolo, though. He a man of his word." Benedic said Baby Bolo was a "[Selo] . . . [who did] missions with us and everything" and Baby Bolo told Benedic that Baby Bolo was "going to get put on [Selo] . . . ." These statements reflected Benedic's gang affiliations and active participation in committing gang crimes with appellant.

Benedic said, "Baby told me recently after we did that little shit he talking about he going to get put on Ce-Low . . . cause that 32, T bone, big T bone gave it to grove. After he did that . . . ." This statement implied appellant recently had told Benedic (after

---

**6** Earlier during Benedic's statement, Benedic indicated appellant (Baby Bolo) had a brother named Little Baby Bolo. Gentle indicated Little Baby Bolo had been a shooting victim.

Benedic and appellant committed the shooting of Willingham) that appellant was going to be put into the Selo clique, and a person named T-bone had given to another gang member the .32-caliber gun previously used to shoot Willingham.

Benedic said, "They said they going to call the people and see if that's . . . my fingerprint. [¶] . . . [¶] . . . They probably want to check my fingerprints on that gun. If not, I'm about to beat this case tomorrow now." Benedic did not here state that police would not find his fingerprints on the gun. Benedic's statement suggested that at some point he may have touched the gun used to kill Willingham.

The following also occurred: "[Benedic]: That's what they really got you down here for? [¶] Gentle: On do low. On Hoover. Nigger, on the set. Asking me questions[7] about . . . Little Bolo shooting. . . . [¶] [Benedic]: Little Bolo or Little Baby Bolo? [¶] Gentle: Little Baby Bolo. [¶] [Benedic]: From when they shot him? [¶] Gentle: Yeah. On ver, because I got pulled over. I was right there. . . . [¶] [Benedic]: Oh, that's what they trying to do. [¶] . . . [¶] . . . Because it was a 9-Deuce and two Ce-Lows that went to go do that mission so now they got 9-Deuce, one Ce-Low and they said that -- they told T-Loc that he fit the description and I'm the only tall one that was out of them two. So I hope, this shit confusing, I hope . . . whatever it is whatever the fuck ain't got no new case, they got no case, they don't know nothing cause I'm trying to slide up out of here." (Italics added.)

This statement implied appellant was saying (1) a 9-Deuce gang member and two Selo members were involved in a shooting involving Little Baby Bolo, (2) police were suggesting that by process of elimination Benedic was one of the two Selo members, i.e., the tall one, but (3) because police allegedly knew nothing, police had no case against Benedic. Benedic did not then deny he may have been involved; if he was, it provided evidence of Benedic's motive in the present case. Moreover, this court has listened to the

---

**7**     Gentle suggested here that police were asking him questions.

CD recording of this statement; Benedic said it in hushed tones, evidencing consciousness of wrongdoing.

The following also occurred: "[Benedic]: This shit confusing because that's the same shit T-Loc talking about. He said on 108th when he got locked up. He said that shit happened on 108th and Hoover. You said 108th and Fig. [¶] Gentle: No, 108th and Fig? [¶] [Benedic]: But T-Loc said 108th and Hoover. That's what the police told him. [¶] Gentle: Yeah. [¶] [Benedic]: And the shit really happened on 109th and Fig. [¶] Gentle: No, they brought that up too. [¶] [Benedic]: That shit too? [¶] Gentle: And they brought that shit up on 108th right at the liquor store. [¶] [Benedic]: Oh, that's deep. [¶] Gentle: Because I'm like liquor store -- [¶] [Benedic]: They don't know who did it, though. They don't know what gang did it. [¶] Gentle: I know. [¶] [Benedic]: Because we didn't blab out nothing. Nigger Baby Bolo said 'yeah I got chased by some Raymonds' so if anything they're going to say there·was some Raymonds because he bought a (unintelligible) he's like when he told the niggers, talked to them, hey man, I just got shot? I just got chased by some Raymonds man. I don't bang. [¶] I just got hit with some Raymonds so bitch ass nigger because it was two niggers. See, I know the whole story."

This statement implied Benedic was saying T-Loc had indicated the present offense occurred on 108th and Hoover, Gentle had indicated the present offense occurred on 108th and Figueroa, but Benedic was correcting T-Loc and Gentle by saying the present offense in fact had occurred at 109th and Figueroa. The statement also implied the gang members involved in the present shooting, including the shooter (appellant) and Benedic, knew the facts about the crime but police did not because those involved in the crime had divulged nothing about it.

Moreover, there was independent evidence appellant was a Hoover member in territory claimed by a rival gang, the Denver Lane gang, when he shot Willingham. We have also listened to the CD recording of the above statement. The statement reasonably implied four things. First, appellant told Benedic that appellant had used a ruse. That is,

15

appellant told Benedic that appellant falsely had told Crawford and Willingham that (1) appellant was a Denver Lane gang member being chased by members of a rival gang, i.e., the Raymond Avenue Crips gang and (2) appellant did not engage in gang activities.

Second, Benedic implied that, as a result of the ruse, police would say, if anything, that members of the Raymond Avenue Crips gang (not appellant) shot Willingham. Third, Benedic *himself* was saying "it [*sic*] was two [persons]," i.e., Crawford and Willingham, involved. Fourth, Benedic knew the whole story, i.e., he knew everything that had happened in connection with the shooting of Willingham. Benedic's statements implied personal knowledge and involvement in the shooting.

Finally, towards the conclusion of the redacted statement, the following occurred: "[Benedic]: Hopefully I get the fuck out tomorrow. I don't know nothing. I didn't see nothing. I wasn't there. I'm not even a gang member. I just associate with the Hoovers. I was born and raised in Hoovers. I don't know nothing else. Therefore -- [¶] [Gentle]: I don't even know that. I don't know nothing."

We have listened to the CD recording of the above statement. In contrast with the frequently hushed tones employed during this conversation, Benedic and Gentle here were speaking loudly and laughing. Benedic's above statement implied a deceptive, self-serving effort, in the event his statements were being monitored, to loudly proclaim his ignorance of, and noninvolvement in, the shooting of Willingham. For example, despite the trial evidence, including Benedic's statement, that he was from the 107 clique of Hoover, he denied in the above quoted statement that he was a gang member. He told Gentle he knew the whole story about what had happened, but in the above statement Benedic denied he knew anything. These facts too evidence consciousness of wrongdoing.

Appellant argues Benedic did not actually admit involvement in the shooting of Willingham and it "is more likely that Benedic, as a gang member confined in the county jail, wanted to do all he could to make himself look tough and important, and avoid being

16

attacked by fellow inmates." However, this alternative explanation, even if it were plausible, went to the weight of the evidence, not its admissibility.

Benedic's various statements to Gentle, viewed in the context of Benedic's entire statement and the evidence in this case, reasonably implied Benedic was criminally involved (as a conspirator and/or accomplice) in the shooting of Willingham; therefore, Benedic's statement was against his penal interest. We conclude the trial court did not abuse its discretion by concluding Benedic's statement was a declaration against his penal interest. (Cf. *Tran*, *supra*, 215 Cal.App.4th at pp. 1218-1219.)

Further, as to whether Benedic's statement was sufficiently reliable, we note the following. Benedic's statement was a jailhouse statement he made to a fellow gang member in confidence. Benedic was not talking to a police officer. The trial court indicated at the admissibility hearing Benedic did not know he was a suspect, or being charged, in this case, or that his statement was being recorded. The trial court noted Benedic laid out his role in a crime, and the court suggested Benedic would not have done so if he had thought Gentle was going to disclose Benedic's statement.

Further still, at various points during his statement, Benedic purported to correct Gentle's understanding of the facts of the present shooting. Although the record suggests Benedic may have been aware of the possibility his statements were being monitored, he elected to discuss the present case, cloaking the discussion in hushed tones, gang language, and code. Benedic and Gentle frequently and laughingly discussed certain gang activities and other gang-related matters; these discussions corroborated the trustworthiness of Benedic's statement.

Although Benedic did not expressly admit to being the shooter in this case, Benedic's statement, fairly read, communicated his criminal involvement in the shooting and did not simply try to shift blame to appellant. The trial court did not abuse its discretion by concluding Benedic's statement was trustworthy. (Cf. *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1400-1401.) Appellant, relying on *Duarte*, argues the fact Benedic was in custody when he made his statement undercuts its reliability. Appellant's

17

reliance on *Duarte* is inapposite. In *Duarte*, the declarant made his statement to a police officer. (*Duarte, supra*, 24 Cal.4th at pp. 609-610.) That is not true in the present case.

We hold the trial court properly admitted into evidence Benedic's statement on the ground the Evidence Code section 1230 declaration against interest hearsay exception applied to the statement.

Moreover, even if the declaration against interest hearsay exception did not apply to Benedic's statement, it does not follow we must reverse the judgment. Brown and Crawford identified appellant prior to trial. Brown's fear of testifying and Crawford's prior gang affiliations explained any failures by Brown and Crawford, respectively, to identify appellant at trial. Appellant had a neck tattoo, and Segura testified he saw one on the man who had been in front of him.

When appellant spoke to the unidentified male by phone, appellant focused on the availability of evidence that appellant committed the crime, not whether appellant committed it. During that phone conversation, appellant never expressly denied he committed the crime. Appellant *asked* the male if "they" *could* have been lying when they said (1) they had photographs of appellant and (2) people were identifying appellant. However, if appellant did not commit the present crime, one would have expected him, not merely to *ask* if "they" *could* have been lying when they said these various things, but to declare unequivocally his innocence and that "they" must have been lying or at least mistaken.

Appellant was a Hoover member, and the murder of Willingham occurred in the territory of a rival gang, i.e., the Denver Lane gang; therefore, appellant had a motive to shoot Willingham. The fact appellant's brother, Little Baby Bolo, apparently had been the recent victim of a gang-related assault also provided a motive for appellant to shoot Willingham in rival gang territory. Any trial court error in connection with its ruling that the declaration against interest hearsay exception applied was not prejudicial. (Cf. *People v. Watson* (1956) 46 Cal.2d 818, 836.)

18

(2) *No Violation of Appellant's Right to Confrontation Occurred.*

Finally, the record demonstrates Benedic was talking with a fellow gang member in confidence.  The statements were made from one jail inmate to another.  Appellant concedes Benedic made his statements to a private person.  The record fails to demonstrate Benedic believed he was being monitored, or that his statement was " ' "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' ([*Crawford v. Washington* (2004) 541 U.S. 36], at pp. 51-52 [158 L.Ed.2d at p. 193].)" (*Arauz, supra*, 210 Cal.App.4th at p. 1401.)  Appellant conceded to the trial court Benedic's statement was nontestimonial.  We conclude Benedic's statement was nontestimonial; therefore, the trial court did not violate appellant's right to confrontation (or right to a fair trial) by admitting the statement into evidence.  (*Id.* at pp. 1401-1402.)

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

ALDRICH, J.

19