Filed 8/18/14  P. v. Perez CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055735 |
| v. | (Super.Ct.No. RIF112730) |
| EZEKIEL PEREZ, JR., | O P I N I O N |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Michele D. Levine, Judge.  Affirmed.

Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, and Lise Jacobson and Vincent P. LaPietra, Deputy Attorneys General, for Plaintiff and Respondent.

1

## I. INTRODUCTION

A jury found defendant and appellant Ezekiel Perez, Jr. guilty as charged of the first degree felony murder of Oscar Carrillo based on the attempted robbery of Carrillo, and found a gang enhancement allegation true. (Pen Code, §§ 187, subd. (a), 186.22, subd. (b)(1).)[1] Defendant was sentenced to 25 years to life in prison.

Defendant and a codefendant, Leroy Gutierrez, were tried together before separate juries. Financial gain, lying-in-wait, and criminal street gang special-circumstance allegations were alleged against defendant and Gutierrez (§ 190.2, subd. (a)(1), (15), (22)), but all three special-circumstance allegations were dismissed against defendant before the prosecution presented its case-in-chief against defendant and Gutierrez.[2]

In arguing the case to defendant's jury, the green jury, the prosecution claimed Gutierrez shot and killed Carrillo during an attempted robbery of Carrillo, and defendant aided and abetted the attempted robbery and resulting murder by driving the getaway car and providing Gutierrez with the gun used in the crimes. On defendant's murder charge, defendant's jury was instructed solely on first degree felony murder based on robbery and attempted robbery and not on any other murder theory.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] Gutierrez's jury, the orange jury, found him guilty of the first degree murder of Carrillo, found the lying-in-wait and gang special-circumstance allegations true, and found a gang enhancement allegation true. The financial gain special-circumstance allegation was dismissed against Gutierrez. Gutierrez was sentenced to life in prison without the possibility of parole after his jury deadlocked on whether to recommend the death penalty during the penalty phase. Gutierrez is not a party to this appeal, having abandoned his appeal before filing an opening brief.

Defendant claims his murder conviction must be reversed because (1) the court erroneously admitted the testimony of Veronica Cantu, recounting out-of-court statements made to her by Gutierrez, who did not testify, suggesting defendant gave Gutierrez the gun Gutierrez used to kill Carrillo, (2) insufficient evidence supported instructing the jury on felony murder based on attempted robbery, and (3) the prosecutor presented inconsistent factual theories to the juries and "made a false argument" to defendant's jury, by arguing to Gutierrez's jury that Gutierrez intended to murder Carrillo but not rob him, while arguing to defendant's jury that Gutierrez intended to rob Carrillo, and defendant shared that intent and aided and abetted an attempted, "botched" robbery of Carrillo, during which Carrillo was murdered.

We find defendant's claims without merit and affirm the judgment.

## II.  BACKGROUND

A. *Veronica Cantu's Testimony Against Defendant*

At the time of trial in October 2011, Cantu had known defendant since 1987, when they were in junior high school together.  On the night of September 30, 2003, Cantu, Gutierrez, defendant, and several other people were smoking methamphetamine at Cantu's apartment in Corona.  Defendant lived several blocks away from Cantu and was dating Cantu's sister, who lived with Cantu, their mother, and Cantu's two children.

Later during the evening on September 30, Cantu told Gutierrez she was tired of being broke and having no money.  Gutierrez told her he knew how to get some money if she was "down," or willing to go along with a plan, and she said, "Yeah, I'm down."

3

Next, Gutierrez told Cantu, "Well you need to give me a ride to find a gun tonight," and Cantu agreed.

Gutierrez left Cantu's house, and around two hours later, Cantu, accompanied by Lindsay Parchcorn, picked up Gutierrez and a person named "Mando" at Stefanie Macias's house. With Cantu driving, the four of them went to the Riverside/La Sierra area, looking for a gun.

At one point, they stopped at a gas station, Gutierrez pointed to another gas station across the street and said, "That's where it's going to take place." At the first gas station, Gutierrez took over driving for Cantu because she was falling asleep, and drove over to the second gas station. There was a "tire or lube" business next to the second gas station.

Gutierrez stopped the car on a side street, behind and around one city block from the second gas station. He told Cantu she was going to wait for him on the side street in the car, he "was going to come out running," and she was going to drive the car onto the 91 freeway. To demonstrate the plan, Gutierrez drove onto the 91 freeway, got off on the next exit, turned into a Stater Bros. parking lot, and said, "we're going to come here, we're going to leave your car here, and my homeboy will be right here waiting for us." Cantu later feel asleep while Gutierrez continued driving. They later returned to Corona, but they did not have a gun. At Cantu's apartment, Gutierrez dropped off Cantu, Parchcorn, and another person they picked up in La Sierra who had a methamphetamine pipe. Gutierrez told Cantu he was going out again to look for a gun because he did not yet have one.

Gutierrez later returned to Cantu's apartment, still without a gun. At that point, Cantu told Gutierrez she thought defendant had a gun, and he should ask defendant whether he could borrow defendant's gun. In response, Gutierrez said he was going to ask defendant for a gun and left Cantu's apartment.

Later during the morning of October 1, and before Cantu went to work around 7:30 a.m., Gutierrez returned to Cantu's apartment. After Gutierrez returned, Cantu saw defendant at her apartment, but she did not see defendant and Gutierrez arrive together. When defendant was at the apartment, but outside of defendant's presence, Gutierrez asked Cantu whether she had any methamphetamine to "smoke out" defendant, meaning let defendant use, in exchange for defendant allowing Gutierrez to use defendant's gun. Cantu understood Gutierrez was saying defendant had agreed to let Gutierrez use his gun, but Cantu did not hear or see Gutierrez and defendant talk about using defendant's gun.[3]

Cantu told Gutierrez she did not have any more methamphetamine for defendant, and began to get ready for work. Before she left for work, she had another conversation with Gutierrez about the robbery, outside of defendant's presence. After Gutierrez called the gas station to see what time it opened, Cantu told him she could not help him during

---

[3] The court instructed defendant's jury that it could use Gutierrez's statements, as testified to by Cantu and made outside defendant's presence, for the limited purpose of evaluating Cantu's testimony and the subsequent actions of both Gutierrez and defendant, but it could not infer defendant knew Gutierrez and Cantu were planning to commit a robbery because defendant was not present when the statements were made. In contrast, statements attributed by Cantu to Gutierrez regarding what Perez may have said— including that Perez agreed to let Gutierrez use defendant's gun—were admitted for all purposes.

the daytime because she worked. Gutierrez told Cantu he would find another getaway driver. Cantu understood she would receive half the money from the robbery for letting Gutierrez use her car.

Gutierrez drove Cantu to work in her car, and kept the car. At this point, Cantu had not seen a gun, but Gutierrez did not say anything more about not having a gun or needing to get a gun. Cantu returned to her apartment around noon on October 1, Gutierrez and defendant were there, and her car was in her garage. Gutierrez was "pumped up," and told Cantu words to the effect that he "just pulled up there," "asked for Oscar [Carrillo]," and "went bam, bam, bam." Gutierrez said defendant was driving.

Cantu returned to work around 1:00 p.m., and drove herself in her car. Later that evening, the police stopped Cantu while she was driving her car and arrested her. After being shown a picture of her car from a surveillance videotape and being told her car was used in a shooting, Cantu admitted giving her car to Gutierrez so he could commit a robbery.

Cantu was charged with murder, but the charge was dismissed after Cantu agreed to plead guilty to robbery and conspiracy, serve a nine-year sentence, and testify truthfully. Cantu had served her sentence and was out of custody at the time of defendant and Gutierrez's trial in October 2011.

B. *Additional Testimony Against Defendant*

After Gutierrez took Cantu to work on the morning of October 1, he and defendant used Cantu's car to take Macias from Cantu's apartment to Macias's home in Corona.

6

Defendant was driving, and as they dropped off Macias Gutierrez told her something to the effect that he was going to take care of something and would call her later. Later that day, Macias learned that a person named Oscar had been murdered.

Around 10:30 a.m. on October 1, Carrillo was shot and killed in front of the garage bay where he was working at the Lube Express on the corner of Magnolia and Pierce. A gas station was adjacent to the Lube Express building.

Witnesses saw a gray car, later identified as Cantu's car, pull in front of the garage bay where Carrillo was working, saw the passenger, later identified as Gutierrez, make a hand motion toward Carrillo to come to the car, and saw Carrillo approach the car. As Carrillo approached or was near the car, Gutierrez fired multiple bullets at him, striking him with six bullets. The driver of the car, later identified as defendant, sped away and drove onto the eastbound 91 freeway.

Around 30 minutes before Carrillo was shot, Jonathan Silva, who was working at the Lube Express with Carrillo, noticed the gray car parked in front of the gas station near the Lube Express. At that time, Gutierrez walked up to Silva and Carrillo, began talking about problems with his car, and asked for a job application. Although Carrillo said they were hiring, Gutierrez did not take an application. Instead, he continued talking about his car; the entire conversation lasted a minute or two. No threats or demands were made, and it did not appear to Silva that Carrillo and Gutierrez knew each other. Gutierrez returned to the car and drove away. No one else was in the car.

7

The car returned a second time around 20 minutes later. This time, two people were in the car; a man later identified as defendant was driving, and Gutierrez was in the front passenger seat. From the passenger seat, Gutierrez called to Carrillo, saying the car was making a noise and asking Carrillo to take a test drive with him, but Carrillo declined.

The car left and returned a third time, when the shooting occurred. Defendant was still driving, Gutierrez was still in the front passenger seat, and this time two women were in the backseat. From the passenger seat, Gutierrez called to Carrillo, saying he had a part for the car. Carrillo approached the car, Silva heard gunshots, and saw Carrillo fall to the ground. No one threatened Carrillo or demanded money.

On October 23, 2003, the policed conducted a traffic stop of defendant's father in an effort to locate defendant. Defendant was in the camper shell of the truck, and was taken into custody and arrested. It appeared defendant had dyed his hair with blonde streaks.

C. *Defendant's Recorded Jail Call*

The jury heard a recording of a telephone call defendant made using a pay phone at the jail. During the call, a woman read defendant a newspaper article about the murder and arrests, and defendant became upset when he heard Cantu was cooperating with the police. Defendant concluded the conversation by telling the woman, "I already told them [the police] I was there."

8

D. *Stipulations*

The parties entered into several stipulations, including that (1) both defendant and Gutierrez were members of Corona Varios Locos, a criminal street gang within the meaning of section 186.22, subdivision (f), (2) on October 2, 2003, when police were conducting a stakeout of Gutierrez to arrest him for the murder of Carrillo, Gutierrez said to someone via cell phone: "That bitch don't know what I did. I'm not going out like that. Yeah, I know I'm hot. I might need to lay low for a while or skate town. I'm not going out like that. You know what I'm saying?," and (3) after Gutierrez made these statements, officers tried to arrest him, but he fled on foot, was captured, and was taken into custody.

## III.  DISCUSSION

A. *Cantu's Testimony Attributing Statements to Gutierrez Was Properly Admitted*

Before Cantu testified, defendant objected to allowing her to testify to statements Gutierrez made to her outside defendant's presence and suggesting that defendant agreed to give Gutierrez the gun Gutierrez used to shoot Carrillo in exchange for some methamphetamine, and that defendant was driving when the shooting occurred. The objections were made on the grounds the statements were hearsay and violated defendant's Sixth Amendment confrontation rights under the *Aranda/Bruton*[4] rule, which

---

[4] *People v. Aranda* (1965) 63 Cal.2d 518 (*Aranda*); *Bruton v. United States* (1968) 391 U.S. 123 (*Bruton*).

9

prohibits a nontestifying defendant's confession from being admitted against a codefendant in a joint trial.

The court ruled Gutierrez's statements did not violate defendant's confrontation rights because they were not testimonial, and the statements were admissible under the declarations against interest exception to the hearsay rule. (Evid. Code, § 1230.) Here, defendant does not claim the statements were testimonial, and he concedes Gutierrez was unavailable to testify. (See *People v. Duarte* (2000) 24 Cal.4th 603, 609 [witness's invocation of Fifth Amendment right against self-incrimination establishes witness's unavailability to testify].) Instead, defendant claims the statements were inadmissible hearsay (Evid. Code, § 1200) because they were not specifically disserving to Gutierrez's penal interests and were untrustworthy (Evid. Code, § 1230). He also claims the statements violated his confrontation rights under *Aranda/Bruton* because they were unaccompanied by "particularized guarantees of trustworthiness." Neither claim has merit.

1. Evidence Code Section 1230

Under Evidence Code section 1230: "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, . . . so far subjected him to the risk of . . . criminal liability . . . that a reasonable man in his position would not have made the statement unless he believed it to be true." The proponent of such evidence must show (1) the declarant is unavailable, (2) the declaration was against

10

the declarant's penal interest when made, and (3) the declaration was sufficiently reliable or trustworthy to warrant admission despite its hearsay character. (*People v. Duarte, supra,* 24 Cal.4th at pp. 609-610; *People v. Brown* (2003) 31 Cal.4th 518, 535.)

As noted, defendant concedes Gutierrez was unavailable to testify, but argues that Gutierrez's statement to Cantu about "smoking out" defendant for providing a gun to use in the robbery were "collateral assertions" not specifically disserving to Gutierrez's penal interests. The declarations against penal interest exception to the hearsay rule does not extend to "collateral assertions" not specifically disserving of the declarant's penal interest. (*People v. Duarte, supra,* 24 Cal.4th at p. 612 ["we long ago determined that 'the hearsay exception should not apply to collateral assertions within declarations against penal interest.'"].) In addition, a hearsay statement "'which is in part inculpatory and in part exculpatory (e.g., one which admits some complicity but places the major responsibility on others)'" does not qualify as a statement against penal interest because it does not meet the test of trustworthiness. (*Ibid.*) But a statement can *both* incriminate others *and* be specifically disserving to the declarant's penal interests, and such statements are admissible if they are trustworthy. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.) Indeed, "'"[t]he focus of the declaration against interest exception to the hearsay rule is the basic trustworthiness of the declaration. [Citations.]"'" (*People v. Tran* (2013) 215 Cal.App.4th 1207, 1216 (*Tran*).)

"'There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court

11

must look to the totality of the circumstances in which the statement was made, whether the declarant spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. . . .'" (*Tran, supra,* 215 Cal.App.4th at p. 1217, quoting *People v. Greenberger, supra,* 58 Cal.App.4th at pp. 334-335; accord, *People v. Cervantes* (2004) 118 Cal.App.4th 162, 174-175.)

Courts have recognized that the least trustworthy or reliable circumstance obtains when the declarant has been arrested and attempts to improve his situation with the police by deflecting criminal responsibility onto others. (*Tran, supra,* 215 Cal.App.4th at p. 1217.) But courts have "found a strong assurance of trustworthiness" when the statement is made in a "purely private, personal setting," or in a "'"conversation . . . between friends in a noncoercive setting that fosters uninhibited disclosures."'" [Citations.]" (*Cheal v. El Camino Hospital* (2014) 223 Cal.App.4th 736, 760.)

We independently review the trial court's preliminary determination whether a hearsay statement is sufficiently trustworthy to qualify as a declaration against penal interest—the same standard courts have traditionally applied in determining whether a hearsay statement bears sufficient indicia of trustworthiness to satisfy the confrontation clause. (*Tran, supra,* 215 Cal.App.4th at pp. 217-218; *People v. Cervantes, supra,* 118 Cal.App.4th at pp. 174-175; *Lilly v. Virginia* (1999) 527 U.S. 116, 137 [independent review applies in determining whether a hearsay statement has sufficient "guarantees of trustworthiness" to satisfy the confrontation clause].) In contrast, we review the trial

12

court's ultimate decision to admit or exclude the statement for an abuse of discretion, bearing in mind that the scope of the court's discretion is limited by the applicable law and reversal is appropriate only when there is no reasonable basis for the court's ruling. (*Tran, supra,* at pp. 1217-1218; *People v. Brown* (2003) 31 Cal.4th 518, 534 [evidentiary rulings reviewed for abuse of discretion].)

Based on all the relevant circumstances, we independently conclude Gutierrez's statement to Cantu, asking her whether she had any methamphetamine to give defendant in exchange for the use of defendant's gun, was both specifically disserving to Gutierrez's interests and sufficiently trustworthy to be admitted as a declaration against Gutierrez's penal interests, notwithstanding its hearsay character. First, Cantu gave detailed testimony that she, Gutierrez, and others spent the night before the murder driving around in Cantu's car while Gutierrez was looking for a gun to use in a robbery Gutierrez was planning with Cantu. As they were driving, Gutierrez told Cantu the robbery was going to occur at the gas station next to the Lube Express where Gutierrez later shot and killed Carrillo. Without having found a gun, Gutierrez and Cantu returned to Cantu's apartment during the early morning hours of October 1.

Cantu then told Gutierrez she thought defendant had a gun. Defendant lived a short distance away from Cantu's apartment; Gutierrez left the apartment, and when he returned a short time later Cantu saw that defendant was also in her apartment. Outside defendant's presence, but while defendant was in the immediate vicinity and Cantu could have easily spoken to him, Gutierrez asked Cantu whether she had any more

13

methamphetamine to "smoke out" or give to defendant in exchange for defendant providing him (Gutierrez) with a gun to use in the robbery.

Gutierrez's statement to Cantu, asking her for methamphetamine to give defendant in exchange for the use of defendant's gun in the robbery Gutierrez was planning with Cantu, was specifically disserving to Gutierrez's penal interests because it directly implicated him in a conspiracy to rob a gas station. (See §§ 182, subd. (a)(1), 184, 211.) The statement was also trustworthy because it did not attempt to *shift* blame to defendant or anyone else. Gutierrez was no less culpable for conspiring to commit robbery because defendant was providing him with a gun to commit the robbery. (Cf. *People v. Duarte, supra,* 24 Cal.4th at pp. 613-617 [statements to police minimizing the declarant's responsibility for a shooting and making declarant look more sympathetic than his accomplice not specifically disserving to the declarant's penal interests and untrustworthy].) Cantu's detailed testimony concerning Gutierrez's search for a gun earlier that morning also support the statement's reliability.

Defendant argues the statement was untrustworthy because Gutierrez apparently lied to Cantu when he told her he was going to rob a gas station, and his true intent was to obtain Cantu's car, and defendant's gun, to use in murdering Carrillo. But defendant offers no reason why Gutierrez would lie to Cantu about wanting to give defendant drugs in exchange for the use of defendant's gun. Gutierrez's prior search for a gun, as testified to by Cantu, and his subsequent use of a gun in the shooting of Carrillo, strongly indicate

he was not lying to Cantu when he indicated defendant was agreeing to let Gutierrez use defendant's gun in exchange for methamphetamine.

### 2. *Aranda/Bruton*

For the same reasons he claims Gutierrez's statement to Cantu did not qualify as a statement against Gutierrez's penal interests, defendant claims the admission of the statement violated his confrontation rights under the *Aranda/Bruton* rule. We reject this claim for the same reasons we rejected defendant's state law evidentiary claim.

In *Bruton*, a nontestifying defendant's confession that he and his codefendant committed a robbery was admitted against the defendant in their joint trial. (*Bruton, supra,* 391 U.S. at p. 126.) The confession was hearsay, did not fall under any exception to the hearsay rule, and the jury was instructed to consider the confession only against the defendant who made the confession. (*Id.* at pp. 124-125, 129.) Despite the instruction not to consider the statement against the codefendant, the high court ruled the admission of the confession in the joint trial violated the codefendant's Sixth Amendment confrontation rights. (*Id.* at pp. 126-128, fn. 3, 137.)

In *Aranda*, which was decided before *Bruton*, the California Supreme Court adopted a judicial rule of practice similar to the rule later adopted in *Bruton*. (*Aranda, supra,* 63 Cal.2d at pp. 530-531.) But to the extent *Aranda* requires the exclusion of evidence that is not required to be excluded under federal constitutional law, it was abrogated by the 1982 enactment of the "truth-in-evidence" provision of Proposition 8. (Cal. Const., art. I, § 28, subd. (d); *People v. Fletcher* (1996) 13 Cal.4th 451, 465.)

15

In *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*), the high court held that only *testimonial* hearsay statements violate a criminal defendant's Sixth Amendment confrontation rights. Such testimonial hearsay statements are admissible only if the declarant is unavailable to testify and the defendant had a prior opportunity to cross-examine the declarant about the statement. (*Crawford, supra,* at p. 59; see also *Davis v. Washington* (2006) 547 U.S. 813, 821 [clarifying that only testimonial statements cause a declarant to be a "witness" within the meaning of the confrontation clause, and "[i]t is the testimonial character of the statement that separates it from other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to the Confrontation Clause."].)

In the wake of *Crawford* and *Davis*, numerous state and federal court cases, including decisions issued by the United States and the California Supreme Courts, have recognized that the confrontation clause is violated only by the erroneous admission of *testimonial* hearsay statements. (See, e.g., *Whorton v. Bockting* (2007) 549 U.S. 406, 420 [*Crawford* eliminated "Confrontation Clause protection against the admission of unreliable out-of-court nontestimonial statements"]; *People v. Loy* (2011) 52 Cal.4th 46, 66 ["'Only the admission of *testimonial* hearsay statements violates the confrontation clause'"]; see also *People v. Arceo* (2011) 195 Cal.App.4th 556, 574-575 & fn. 12 [discussing cases and coming to the same conclusion].) As noted, defendant does not claim that Gutierrez's statement to Cantu was testimonial. Thus, its admission did not violate defendant's confrontation rights.

16

B. *Substantial Evidence Supports Defendant's First Degree Felony Murder Conviction Based on Robbery or Attempted Robbery*

Defendant's jury was instructed on first degree felony murder based on robbery or attempted robbery, and not on any other murder theory.[5]  Defendant claims insufficient evidence supports his felony murder conviction for two reasons:  (1) there was insufficient evidence he knew Gutierrez was going to rob Carrillo or intended to aid and abet Gutierrez in robbing Carrillo; and (2) there was insufficient evidence of a causal or temporal relationship between any robbery or attempted robbery of the gas station and the shooting of Carrillo.

1.  Applicable Legal Principles

The applicable standard of review is well settled.  In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial

---

[5] Defendant's jury was instructed:  "The defendant is charged in Count 1 with first-degree murder, under a theory of Felony Murder.  [¶]  The defendant may be guilty of murder under a theory of Felony Murder even if another person did the act that resulted in the death.  I will call the other person the perpetrator.  [¶]  To prove that the defendant is guilty of first-degree murder under this theory, the People must prove that:  [¶]  One, the defendant attempted to commit or aided and abetted a robbery or attempted robbery;  [¶]  Two, the defendant intended to commit or intended to aid and abet the perpetrator in committing a robbery or attempted robbery;  [¶]  Three, if the defendant did not personally commit or attempt to commit a robbery, then a perpetrator whom the defendant was aiding and abetting personally committed or attempted to commit a robbery;  [¶]  Four, while committing or attempting to commit a robbery, the perpetrator caused the death of another person; and  [¶]  Five, there was a logical connection between the cause of death and the commission or attempted commission of the robbery.  The connection between the cause of death and the robbery or attempted robbery must involve more than just their occurrence at the same time and place."

17

evidence—that is, reasonable, credible evidence of solid value—upon which a jury comprised of rational persons could have found the defendant guilty of the crime beyond a reasonable doubt.  (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

A killing committed in the perpetration of an attempted robbery or robbery is first degree murder.  (§ 189.)  And "[u]nder long-established rules of criminal complicity, liability for such a murder extends to all persons '*jointly engaged at the time of such killing* in the perpetration of or an attempt to perpetrate the crime of robbery' [citation] 'when *one of them kills* while acting in furtherance of the common design.'  [Citation.]" (*People v. Pulido* (1997) 15 Cal.4th 713, 716, italics added.)

Robbery is the felonious taking of personal property in the possession of another, from his person and immediate presence and against his will, accomplished by means of force or fear and with the specific intent to permanently deprive him of the property. (§ 211; *People v. Clark* (2011) 52 Cal.4th 856, 943.)  Attempted robbery requires neither the commission of an element of robbery nor the completion of a theft or assault; instead, it requires a specific intent to commit robbery and a direct but ineffectual act towards its commission.  (*People v. Lindberg* (2008) 45 Cal.4th 1, 24, 27.)

The specific intent to commit robbery is the mental state element required for first degree felony murder based on robbery or an attempt to commit robbery.  (*People v. Friend* (2009) 47 Cal.4th 1, 49.)  "[A]n aider and abettor will 'share' the perpetrator's specific intent when he or she knows the full extent of the perpetrator's criminal purpose

18

and gives aid or encouragement with the intent or purpose of facilitating the perpetrator's commission of the crime." (*People v. Beeman* (1984) 35 Cal.3d 547, 560.)

A jury may infer that a defendant harbored a specific intent to commit robbery, or any crime, from all of the facts and circumstances shown by the evidence. (*People v. Lindberg, supra,* 45 Cal.4th at p. 27, citing *People v. Bloom* (1989) 48 Cal.3d 1194, 1208 ["Evidence of a defendant's state of mind is almost inevitably circumstantial, but circumstantial evidence is as sufficient as direct evidence to support a conviction."].)

2.  Substantial Evidence Shows Defendant Intended to Aid and Abet a Robbery

Defendant argues the evidence did not permit a reasonable inference he harbored a specific intent to commit a robbery, the mental state necessary to convict him of the first degree felony murder of Carrillo based on robbery or attempted robbery. Defendant points out that even though he was at Cantu's apartment when Cantu and Gutierrez discussed robbing the gas station, there was no evidence he overheard their conversation or that either of them told him about their plan to rob the gas station. He also argues Gutierrez must have lied to Cantu about robbing the gas station; and Gutierrez's true intent was to shoot and kill Carrillo, not rob anyone.

We conclude the jury could have reasonably inferred defendant believed Gutierrez was going to commit a robbery and that defendant intended to aid and abet Gutierrez in the commission of that robbery. First, defendant's jury was instructed it could use Gutierrez's statements, as testified to by Cantu and made outside defendant's presence, for the limited purpose of evaluating Cantu's testimony and the subsequent actions of

19

both Gutierrez and defendant, but it could not use the statements *to infer defendant knew Gutierrez and Cantu were planning to commit a robbery*, because defendant was not present when the statements were made.

But the court did not limit the jury's use of Gutierrez's statements for any other purpose, and the statements supported a reasonable inference that defendant had in fact agreed to let Gutierrez use his gun in a robbery in exchange for some methamphetamine. Defendant was at Cantu's apartment on the morning of October 1 and was in the immediate vicinity of Cantu and Gutierrez when Gutierrez asked Cantu whether she had any methamphetamine to give defendant in exchange for the use of defendant's gun. Accordingly, Cantu could have easily asked defendant whether he was, in fact, agreeing to lend his gun to Gutierrez so Gutierrez could use it in a robbery. Defendant's immediate availability for questioning by Cantu on the point bolstered the reasonableness of the inference that defendant had, in fact, agreed to lend his gun to Gutierrez for Gutierrez's use in a robbery.

Defendant's and Gutierrez's subsequent actions in the 30 minutes or so before the shooting occurred also supported a reasonable inference that defendant intended to aid and abet Gutierrez in committing a robbery by driving the getaway car. Some 30 minutes before the shooting, Gutierrez approached Silva and Carrillo from the gas station, where Silva saw that Cantu's car was parked. At that time, Gutierrez briefly spoke to Silva and Cantu, asking for a job application and talking about problems with Cantu's car, then he left. Around 20 minutes later, defendant, driving Cantu's car, drove Gutierrez to the front

20

of the Lube Express where Gutierrez attempted to lure Carrillo into the car. After Carrillo refused to get into the car, defendant drove away with Gutierrez, then returned a third time when Gutierrez again tried to engage Carrillo in conversation just before he shot him. After the shooting, defendant sped away and drove onto the 91 freeway, in conformity with the robbery plan which Cantu and Gutierrez had discussed earlier.

All of this evidence supports a reasonable inference—not a speculative inference or mere suspicion[6]—that defendant believed Gutierrez intended to commit a robbery of Carrillo at the Lube Express and that defendant intended to aid and abet Gutierrez in the commission of that robbery, by driving the getaway car and providing the gun. In sum, defendant's and Gutierrez's actions preceding the shooting, in light of the previous discussion between Cantu and Gutierrez about their plan to rob the gas station, supported a reasonable inference that defendant believed Gutierrez intended to rob Carrillo at the Lube Express *and* intended to aid and abet Gutierrez in committing that robbery—even if Gutierrez never truly intended to commit any robbery but only intended to shoot and kill Carrillo.

---

[6] We recognize that evidence which merely raises a suspicion of the defendant's guilt is not sufficient to support a conviction. Suspicion is not evidence; it merely raises the possibility, and this is not a sufficient basis for an inference of fact. (*People v. Reyes* (1974) 12 Cal.3d 486, 500; *People v. Morris* (1988) 46 Cal.3d 1, 21 [a reasonable factual inference may not be based on "'suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work.'"].)

21

3. Substantial Evidence Shows the Attempted or Aborted Robbery of Carrillo and the Shooting of Carrillo Were Part of One Continuous Transaction

"[T]he felony-murder rule requires both a *causal* relationship and a *temporal* relationship between the underlying felony and the act resulting in death. The causal relationship is established by proof of a logical nexus, beyond mere coincidence of time and place, between the homicidal act and the underlying felony . . . . The temporal relationship is established by proof the felony and the homicidal act were part of one continuous transaction." (*People v. Cavitt* (2004) 33 Cal.4th 187, 193.)

In other words, "[t]he killing is considered to be committed in the perpetration of the underlying felony if the acts were part of a continuous transaction. [Citation.] No strict causal or temporal relationship between the murder and underlying felony is required. [Citation.]" (*People v. Booker* (2011) 51 Cal.4th 141, 175.)[7]

Defendant argues there was insufficient evidence of either a causal or a temporal relationship between the aborted robbery of the gas station and the murder of Carrillo.

[7] The jury was instructed pursuant to CALCRIM No. 549 that: "In deciding whether the act causing the death and the felony were part of one continuous transaction, you may consider the following factors: [¶] One, whether the felony and the fatal act occurred at the same place; [¶] Two, the time period, if any, between the felony and the fatal act; [¶] Three, whether the fatal act was committed for the purpose of aiding the commission of the felony or escape after the felony; [¶] Four, whether the fatal act occurred after the felony but while the perpetrator continued to exercise control over the person who was the target of the felony; [¶] Five, whether the fatal act occurred while the perpetrator was fleeing from the scene of the felony or otherwise trying to prevent the discovery of [*sic*] reporting the crime; [¶] Six, whether the felony was the direct cause of the death; and [¶] Seven, whether the death was the natural and probable consequence of the felony."

Because Gutierrez's efforts focused on Carrillo at the Lube Express and not the gas station he discussed with Cantu, defendant argues there was no attempted robbery; thus there was no continuous transaction between the nonexistent attempted robbery and the shooting of Carrillo. Defendant also asserts that because the evidence shows Gutierrez only intended to kill Carrillo and not rob him, there was no logical nexus between the nonexistent attempted robbery and the shooting.

Defendant's arguments are based on his self-serving view of the evidence and ignore evidence that supports a contrary view. For the reasons discussed, defendant's and Gutierrez's actions immediately preceding the shooting support a reasonable inference that defendant *believed* Gutierrez intended to rob Carrillo at the Lube Express, and that defendant intended to aid and abet Gutierrez in the commission of that robbery. In short, the evidence shows defendant and Gutierrez were attempting to rob Carrillo, first when they approached Carrillo in the car and asked him to take a ride with them, and later when they returned and called Carrillo to the car a second time. That Gutierrez decided to target Carrillo at the Lube Express for a robbery rather than the gas station, or that Gutierrez never intended to commit a robbery in the first place, is immaterial to whether defendant believed a robbery was to take place and intended to aid and abet Gutierrez in the commission of that robbery. Because substantial evidence shows Carrillo was the target of defendant's intended robbery, there was a logical nexus between the attempted or aborted robbery of Carrillo and Carrillo's murder.

23

C. *The Prosecutor Did Not Commit Misconduct in Relying on Different Legal and Factual Theories to Convict Defendant and Gutierrez*

Lastly, defendant claims the prosecutor committed misconduct in relying on two different theories to convict him and Gutierrez of first degree murder. The essence of defendant's argument is that the two theories were inconsistent and irreconcilable, but that is not the case.

To support his claim, defendant relies on *In re Sakarias* (2005) 35 Cal.4th 140, a habeas proceeding involving two defendants who were convicted in separate trials of murdering a woman with a hatchet and a knife. (*Id*. at p. 144.) Each defendant participated in the fatal attack on the woman, but in each trial the prosecutor presented selected portions of the evidence and inconsistently claimed each defendant inflicted all the fatal "chopping" wounds with the hatchet blade, when all of the evidence showed only one defendant could have inflicted those wounds. (*Id*. at pp. 147-148.) Each defendant was convicted of first degree murder with special circumstances and was sentenced to death. (*Id*. at p. 144.)

In reversing the conviction of the defendant who was prejudiced by the prosecutor's presentation of what was clearly a false factual theory, the court explained: "[F]undamental fairness does not permit the People, without a good faith justification, to attribute to two defendants, in separate trials, a criminal act only one defendant could have committed." (*In re Sakarias, supra,* 35 Cal.4th at pp. 155-156.) The court continued: "[W]e hold that the People's use of irreconcilable theories of guilt or

24

culpability, unjustified by a good faith justification for the inconsistency, is fundamentally unfair, for it necessarily creates the potential for—and, where prejudicial, actually achieves—a false conviction or increased punishment on a false factual basis for one of the accuseds." (*Id*. at pp. 159-160.)

*Sakarias* was distinguished in *People v. Richardson* (2008) 43 Cal.4th 959, another case involving two defendants who were convicted in separate trials of murdering the same woman. (*Id*. at p. 1015.) Unlike the prosecutor in *Sakarias*, the prosecutors in *Richardson* did not rely on inconsistent factual theories to convict each defendant. Instead, in both trials the prosecution consistently claimed that defendant Richardson was the actual killer while his codefendant, Brown, acted as an aider and abettor. (*People v. Richardson, supra,* at pp. 1015-1016.) The court in *Richardson* observed: "Variations in emphasis where, as here, the underlying theory of the case was consistent at both trials, does not amount to inconsistent and irreconcilable theories." (*Id.* at p. 1017.)

Here, defendant complains that the prosecutor argued to Gutierrez's jury, the orange jury, that Gutierrez *never intended to rob the gas station or Carrillo*, and intended all along to simply shoot and kill Carrillo on behalf of his fellow Corona Varios Locos gang member, Tommy Pena, because Carrillo was a "snitch." In contrast, the prosecutor argued to defendant's jury, the green jury, that *Gutierrez intended to rob Carrillo* but shot and killed Carrillo before he could obtain any money from him—i.e., an attempted robbery of Carrillo.

The problem with defendant's argument is that the varying intents the prosecutor ascribed to Gutierrez before each jury are not inconsistent. Based on all of the evidence, Gutierrez could have intended to rob Carrillo before he intentionally shot and killed him for being a snitch, but decided to abort the robbery after Carrillo refused Gutierrez's request that he get into Cantu's car for a test drive. The prosecutor consistently argued to both juries that Gutierrez was the shooter and defendant was the aider and abettor.

Additionally, the legal theory presented to Gutierrez's jury was that Gutierrez intentionally killed Carrillo by means of lying in wait (§ 190.2, subd. (a)(15)) and for the benefit of his gang (§ 190.2, subd. (a)(22)), not whether Gutierrez killed Carrillo during a robbery or attempted robbery (§ 189). As the People point out, the prosecutor's argument to Gutierrez's jury "can best be seen as an effort to get [Gutierrez's] jury to focus on whether or not Gutierrez engaged in targeted killing" for the benefit of his gang.

The verdict against Gutierrez is entirely consistent with (1) Gutierrez's having an initial but aborted intent to rob Carrillo *and* (2) the verdict finding defendant guilty of first degree felony murder based on robbery or attempted robbery. The prosecutor did not present a false factual theory to either jury. Accordingly, the verdict against defendant was not obtained by fundamentally unfair means in violation of his due process rights. (*In re Sakarias, supra,* 35 Cal.4th at pp. 159-160.)

## IV.  DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

26

KING
                                             J.


We concur:

RAMIREZ
                    P. J.

McKINSTER
              J.