Filed 11/14/25  P. v. Mota CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| THE PEOPLE, | B336098 |
| Plaintiff and Respondent, | Los Angeles County |
| v. | Super. Ct. No. VA156398 |
| IVAN JOSE MOTA, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Joseph R. Porras, Judge.  Affirmed.

Sylvia W. Beckham, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Xiomara Costello and Stefanie Yee, Deputy Attorneys General, for Plaintiff and Respondent.

————————————

A jury convicted Ivan Mota of first degree murder and being a felon in possession of a gun.  Mota argues this result must be reversed because the trial court erred by admitting his co-defendant's statement as a declaration against penal interests under Evidence Code section 1230 (section 1230).  We affirm.

I

Mota, Damian Leon, and Victor Alonso are all members of the Florencia 13 gang, known by the monikers Shadow, Terco, and Tokes or Toker, respectively.  Gustavo Venegas was a member of the Pico Nuevo gang, known by the moniker Villian.

Surveillance video from the Vagabond Inn in Whittier shows a light-colored Honda Accord pull into the parking lot a little after two o'clock one morning.  A man later identified as Mota gets out and goes upstairs.  The driver, Leon, pops the hood, and then moves the car a few spaces over.  Mota comes back to the car with Alonso.  Leon and Venegas leave the car and accompany Mota and Alonso back up to the room.  About an hour later, Leon comes back to the car.  A short while later, the other three men join him.  Alonso returns to the room.  Venegas and Mota both get in the backseat; Venegas on the driver's side, and Mota on the passenger's side.

A few minutes after the car left the parking lot, gunshots woke Monica Carbone, a resident on California Street, less than a mile from the motel.  Carbone looked out and saw a tan Honda passing on the street.  She got back in bed, then heard a few more shots.

Officer Tom Osendorf arrived at the scene a few minutes later.  He found Venegas face down on the street.  Venegas had gunshot wounds to his right cheek, the right side of his neck, and his forehead.  The right cheek shot was fired from about half an

2

inch away and the other two also were from a short distance. The autopsy recovered a .38 caliber slug from Venegas's brain. Police found the casing from a .40 caliber cartridge in front of a house a few doors down from where they found Venegas's body.

The next day police found a tan Honda registered to Leon on the side of an onramp to the U.S. 101. The car had been set on fire with gasoline.

Police arrested Mota about a week later. They placed him in a cell with an undercover agent: a *Perkins* agent, so called in reference to *Illinois v. Perkins* (1990) 496 U.S. 292, 294. Police recorded Mota's conversations with the agent. The agent pretended to be an older Florencia 13 gang member. The agent told Mota he was being held because he had shot a rival gang member at a gas station. The agent said he had been in and out of prison since he was 20. After establishing Mota was also from the agent's supposed gang, the agent asked Mota what he was in for and told him he could advise him. Mota told the agent he thought someone had snitched on him and that it had to be Terco because he was the only other one there. Mota told the agent he had used a .38 to shoot someone from another gang three times from about a foot away. Mota told the agent the victim disrespected Mota's homie. Mota told the agent the driver had no idea that Mota was going to kill the man.

During a later interview with detectives, Mota told a different story. Mota said Venegas had two guns when they were in the backseat of the car. Venegas fired through the moon roof with one. His expression made Mota nervous, and so Mota grabbed for the other gun. As they struggled over the gun, it

3

went off and accidentally killed Venegas.  Mota claimed Leon came around to open the door to dump Venegas's body.

On phone calls Mota made from the jail, Mota's brother and mother specifically asked him if he had committed the murder.  Mota did not deny it.  Rather, he told his brother the investigators had all the evidence pointing toward Mota, and asked "what's there fucking for me to answer you, fool?"  Mota told his mother someone had snitched on him.

Police arrested Leon three days later and put him in a cell with the same undercover agent.  Again, the agent pretended to be an older gang member from Leon's gang.  The agent asked what Leon was in for and offered to give him advice.  Leon repeatedly told the agent that he had not killed the victim, that it had been Shadow.  Leon told the agent Venegas had been a "good homie" of his.  Leon told the agent after they drove away from the motel, he test fired his gun, a .40 caliber, out the moonroof a few times.  Immediately after, he heard gunshots in the backseat, causing his ears to ring.  He said Mota opened the car door and pushed Venegas's body out of the moving car.   Mota told Leon, "I did it for Toker.  Don't be mad at me.  I did it for Toker."  Leon said he assumed Toker told Mota to do it because Toker had been stabbed by someone related to the Pico Nuevo gang.

Leon told the agent after Mota disposed of Venegas's body, he pointed his gun at Leon and told him to get them out of there.  Leon drove them to his daughter's aunt's house, and they left the .38 and .40 caliber guns there.  Leon later retrieved the guns and gave them to Alonso, without telling Mota.

Mota took the car after the murder and left it somewhere.  Leon found it without telling Mota and removed some photos of his daughter.  Mota later showed Leon where it was, and Leon's

4

dad set the car on fire to destroy evidence. Indeed, an officer later testified the burning meant they could not retrieve any evidence from the car.

A gang expert testified that, if someone disrespected a gang member, that gang member and other members of the gang would be expected to retaliate.

An information charged Mota with murder and being a felon in possession of a weapon. Leon pleaded guilty to charges of being an accessory to murder and grossly negligent discharge of a firearm.

Mota proceeded to trial. Mota moved in limine to exclude Leon's statements to the *Perkins* agent. Because he had not yet been sentenced, Leon invoked his Fifth Amendment right, and the court found him unavailable. The trial court ruled the statements were sufficiently against Leon's interests to be admissible and denied Mota's motion.

A jury convicted Mota of first degree murder and being a felon in possession of a firearm. At a bench trial, the court found true the aggravating factor that Mota engaged in violent conduct that showed he is a serious danger to society. The court sentenced him to 13 years plus 25 years to life in prison.

Mota appealed.

## II

Mota argues his conviction must be overturned because the trial court erred in finding Leon's statement was against his penal interests and therefore admissible under section 1230. The trial court's ruling, however, was correct.

## A

In general, out-of-court statements are inadmissible hearsay. (*People v. Jasso* (2025) 17 Cal.5th 646, 668

(*Jasso*).)  There are many exceptions to this rule.  Section 1230 lays out one, which states (with our emphasis):  "Evidence of a statement by a declarant having sufficient knowledge of the subject is not made inadmissible by the hearsay rule if the declarant is unavailable as a witness and the statement, when made, was so far *contrary to the declarant's pecuniary or proprietary interest*, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true."

The rationale for the rule is that people have a strong interest in not being criminally implicated and so they would not make such a statement unless it were true.  We thus presume the normal dangers attendant on hearsay statements are absent.  (*Jasso*, *supra*, 17 Cal.5th at p. 668.)  The proponent of the declaration must show that the declarant is unavailable, that the declaration was against the declarant's interest when made, and that the declaration was sufficiently reliable.  (*Ibid*.)  Determining whether a statement is truly against the declarant's interests is a nuanced and context-specific evaluation.  (*Ibid*.)  The court looks at the effect of the statement as a whole and considers the circumstances under which the statement was made, in addition to the words used.  (*Ibid*.)

Section 1230 makes only statements specifically disserving to the declarant admissible.  This result does not extend to collateral statements.  (*People v. Leach* (1975) 15 Cal.3d 419, 441.)  Temporal proximity to a qualifying statement does not guarantee the different statement's veracity.  (*Williamson v. U.S.*

6

(1994) 512 U.S. 594, 599–600 ["that a person is making a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts"].)

Our Supreme Court has declined to establish a "rule that permitted admission of no more of a declarant's statement than was necessary to expose him to criminal liability." Therefore the court need not "sever and excise any and all portions of an otherwise inculpatory statement that do not 'further incriminate' the declarant." (*People v. Grimes* (2016) 1 Cal.5th 698, 716–717 (*Grimes*) [noting the *Leach* rule requires a contextual approach].)

Rather, the court must determine whether each statement, considered in context, is sufficiently against the declarant's interest that a reasonable person would not make it if it were not true. (*Grimes, supra,* at p. 716.)

## B

There are three requirements for application of section 1230: the declarant was unavailable, the statement was against the declarant's interests when made, and the circumstances show the statement was reliable. (*Jasso, supra*, 17 Cal.5th at p. 668.) Our review of the trial court's finding is deferential. (*Id.* at p. 669.)

## 1

Mota concedes Leon was unavailable.

## 2

The trial court found that Leon's statements to the agent passed the test: in context, they were sufficiently against Leon's interest that he would not have made them if they were not true.

Mota argues that portions of Leon's statements were not against his penal interests, were not intertwined with inculpatory statements, and therefore should have been excised.

7

Although Leon told the agent Mota killed Venega and that Leon had no idea Mota was going to do so, the net effect of Leon's statement was against his self-interest. He placed himself in the car as the driver. He admitted to shooting his gun through the moon roof, an action that led to a charge against him of grossly negligent shooting of a firearm. His statements also implicated him as an accessory after the fact to the murder. His statements that Mota killed Venega established Leon knew the circumstances of the killing. Despite this knowledge, Leon helped Mota hide or get rid of evidence, including the guns and the car.

Mota argues Leon's actions in getting rid of the guns and car helped cover Leon's action, not Mota's. This point is not well taken. Before taking those actions of disposing of the guns and car, Leon was not implicated in the murder. He was taking steps to conceal the murder Mota committed and in so doing creating his own liability. Mota emphasizes Leon said Mota had him at gunpoint, but Leon took the majority of these actions after getting out of the car.

The trial court correctly noted this case is analogous to *People v. Wilson* (1993) 17 Cal.App.4th 271 (*Wilson*), and *People v. Tran* (2013) 215 Cal.App.4th 1207 (*Tran*). In *Wilson*, the court admitted statements a wife made to police detectives. (*Id* at. p. 274.) In the statements, the woman said her husband called her, told her he had shot at people with a gun, where the gun was, and how to dispose of it. (*Ibid*.) The woman admitted to the detective that she had done as her husband asked. (*Ibid*.) At trial, the wife invoked the spousal privilege. (*Ibid*.) The husband objected to the portion of her statement about the husband committing murder was not disserving of the wife's interests and

should be excluded. (*Ibid*.) The court disagreed, finding the wife's declaration of her knowledge of the murder was against her interest because it established an element of the crime of accessory to murder, and the court of appeal affirmed. (*Id*. at p. 276.)

Similarly, in *Tran*, the defendant's nephew helped the defendant destroy a car the defendant had used in a murder. (*Tran, supra*, 215 Cal.App.4th at p. 1218.) The court of appeal affirmed the trial court's determination that the nephew's statements -- that the defendant had done something really bad, and had shot someone -- were against the nephew's penal interests. (*Id*. at 1218–1220.) This was so because that knowledge made the nephew an accessory to murder. (*Ibid*.)

Mota also argues that Leon's statements about Mota's motivation for the murder should have been excluded because they were not disserving to Leon and they lacked foundation. These points are incorrect. Immediately after the shooting, Mota told Leon, "Don't be mad. I did it for Toker." This statement told Leon that Mota had committed premeditated murder. Leon admitting this knowledge precludes him from arguing he helped Mota conceal the guns and car because he thought Mota had *accidentally* shot Venegas, or done so in *self-defense*. This statement is precisely why Leon is an accessory to murder. Leon's statements that he knew Toker had had some problems with someone from Pico Nuevo cements his knowledge that Mota committed murder. Contrary to Mota's assertion, these statements could not be severed because they were integral to Leon's declaration against his penal interests.

In this respect the case is analogous to *People v. Samuels* (2005) 36 Cal.4th 96. There the defendant objected to a

statement by a third party saying the defendant had paid him to kill the victim. (*Id*. at p. 120.) The defendant argued the portion inculpating her should have been excised because it was not against the third party's interest. (*Ibid*.) The Supreme Court disagreed, finding a statement that the third party had engaged in murder for hire admitted to a particularly heinous type of murder. (*Id*. at p. 121.) Moreover, that the defendant had paid the third party for the murder was an integral part of the statement that could not be excised. (*Ibid*.)

The trial court did not err in finding the net effect of Leon's statements was against his penal interests.

3

Finally, we consider whether the circumstances of Leon's statement show the statement was reliable. The evaluation of trustworthiness requires a court to apply its knowledge of how people actually behave to the facts of the case. In other words, judges must employ practical judgment. (*People v. Chhoun* (2021) 11 Cal.5th 1, 48.) Courts have noted "the least reliable circumstances" are those where the declarant is under arrest and tries to curry favor by deflecting blame onto others, while the "most reliable" are where the declarant is speaking to a friend in a noncoercive setting. (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 335.)

Our situation falls somewhere in the middle. Leon obviously had no idea the *Perkins* agent was a cop. Rather, Leon thought he was speaking to a fellow gang member, a trustworthy new acquaintance who wanted to help him. Although Leon was reluctant to share details, at the agent's urging he admitted to culpable actions. Nothing in his statement suggests he was

10

trying to boast or show off for this older gang member. The circumstances of Leon's statement support admissibility.

4

Mota argues that the trial court erred in comparing the substance of Leon's statement to Mota's and finding the similarities supported the reliability of Leon's statements. We need not reach this argument because Leon's statements met the requirements of section 1230.

C

We do not reach the question of whether admitting this statement was harmless error. It was no error at all. But we do observe Mota's own statements to the agent supplied virtually the same information. In practical terms, this appeal is academic.

**DISPOSITION**

We affirm.


WILEY, Acting P. J.

We concur:


VIRAMONTES, J.



UZCATEGUI, J.*

---

\* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.